**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSHUA BRENT SQUIRREL, a/k/a
Cubby,

*Defendant-Appellant.*

No. 08-4150

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MICHAEL EDWARD SLEE,

*Defendant-Appellant.*

No. 08-4151

Appeals from the United States District Court
for the Western District of North Carolina, at Bryson City.
Lacy H. Thornburg, District Judge.
(2:06-cr-00004-LHT-DLH-2; 2:06-cr-00004-LHT-DLH-3)

Argued: October 15, 2009

Decided: December 7, 2009

Before TRAXLER, Chief Judge, WILKINSON,
Circuit Judge, and HAMILTON, Senior Circuit Judge.

Vacated and remanded by published opinion. Senior Judge Hamilton wrote the opinion, in which Chief Judge Traxler and Judge Wilkinson joined.

---

**COUNSEL**

**ARGUED**: Randolph Marshall Lee, Charlotte, North Carolina, for Appellants. Jennifer A. Youngs, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** William C. Ingram, Jr., OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greensboro, North Carolina, for Appellant Michael Edward Slee. Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

---

**OPINION**

HAMILTON, Senior Circuit Judge:

The issue presented in this appeal is whether the district court erred when it held appellants Joshua Brent Squirrel (Squirrel) and Michael Edward Slee (Slee) jointly and severally liable for additional restitution to the Estate of Tamara Susan Seay in the amount of $1,459,854.22. Concluding that the district court so erred, we vacate the appellants' judgments and remand with instructions to amend the judgments by omitting the $1,459,854.22 amount.

I

On February 8, 2006, a federal grand jury in the Western District of North Carolina returned a five-count indictment against Terence Howard Roach (Roach), Squirrel, and Slee. Roach was charged with first degree murder, 18 U.S.C. § 1111; kidnapping, *id.* § 1201(a)(2); and use of a firearm

during and in relation to a crime of violence, *id.* § 924(c)(1)(A). Squirrel and Slee were charged in separate counts as accessories-after-the-fact to first degree murder, *id.* §§ 3, 1111. All three defendants entered into plea agreements with the government, with Roach agreeing to plead guilty to both the first degree murder and § 924(c) counts, and Squirrel and Slee agreeing to plead guilty to their respective accessory-after-the-fact counts.

On August 4 and 11, 2006, Roach, Squirrel, and Slee, along with their respective counsel, appeared before a United States Magistrate Judge for a Rule 11 hearing to formally enter their guilty pleas. As to each respective defendant, the magistrate judge found that the guilty plea was knowingly and voluntarily made, and that the defendant understood the charges, potential penalties, and consequences of the plea.

Prior to sentencing, a United States Probation Officer prepared a Presentence Report (PSR) for each defendant. The PSRs summarized the facts surrounding the charges in this case as follows.[1]

On January 15, 2006, a church youth group from Florida was hiking in the Deep Creek area of the Great Smoky Mountains National Park[2] and discovered the dead body of a female, later identified as the victim, eighteen-year-old Tamara Susan Seay (Seay), an enrolled member of the Eastern Band of the Cherokee Indians (the Tribe).[3] Seay was clothed and lying on her back in a pool of blood with visible wounds to her face and head. An autopsy revealed two gunshot wounds to the head as the cause of death. One gunshot

---

[1]The district court ultimately adopted the findings in the PSRs as its own.

[2]The Deep Creek area is located approximately three miles from Bryson City, North Carolina and thirteen miles from Cherokee, North Carolina.

[3]Roach, Squirrel, and Slee also were enrolled members of the Tribe.

wound was to the frontal area of the forehead, the other to the lower lip.

Two days earlier, around 9:30 p.m. on January 13, 2006, Seay was seen getting into a car with Roach and Slee. Seay was intoxicated and had passed out, so she had to be carried into the car. Earlier in the evening, Seay had been drinking with Roach and Squirrel at the home of Glen David Jumper (Big Dave) in Cherokee. Friends reported that Seay, Roach, and Squirrel went into a back room of the home, and they believed the three were engaging in sex. The friends described what they believed as "bad screaming." Roach and Squirrel left the home shortly after coming out of the back room. When Seay came out, she was agitated and threatened to call her uncle to "take care of" Roach and Squirrel. Not wanting any trouble at his home, Big Dave "call[ed] around" trying to get in touch with Roach and Squirrel to ask them to return and pick up Seay and take her home. Eventually, Roach and Slee arrived at Big Dave's home and picked up Seay.

After Seay's body was found on January 15, 2006, Seay's friends and family members reported that Roach, Squirrel, and Slee had told people that Roach and Slee had driven onto a gravel road and met an unknown male individual in a silver car and that Seay had left with this individual. Roach and Slee claimed they had not seen Seay since that time.

Around the same time, another individual approached the Cherokee Police Department and turned over a black .38 caliber revolver. It was later determined that Squirrel had given the revolver to this individual, asking the individual to hold it for him. Suspicious of this request, the individual turned the revolver over to the police.

On January 20, 2006, Roach, Squirrel, and Slee were interviewed separately by agents of the Federal Bureau of Investigation (FBI). Squirrel was the first to be interviewed. Initially, he falsely told the agents that he had last seen Seay when she

entered the silver car. Thereafter, he admitted seeing Roach and Slee at approximately 11:00 p.m. on January 13, 2006 when they arrived at his home in Slee's car. Roach told Squirrel he had shot Seay. Squirrel, in disbelief, asked Slee if Roach was telling the truth, and Slee confirmed that Roach had shot Seay. Roach then handed Squirrel a .38 caliber revolver and told him to get rid of the weapon. Subsequently, Squirrel threw the revolver into the woods for the night, recovered it the next morning, and gave it to another individual to hold for him. Squirrel identified the .38 caliber revolver in police custody as the one he received from Roach.

Slee was interviewed next. During his interview, Slee confirmed that he and Roach had picked up Seay at Big Dave's home on the night of January 13, 2006. On the way to pick up Seay, Roach told Slee that Seay had stolen drugs from him and owed him a lot of money. After Seay was placed in the car, Roach instructed Slee to drive towards Bryson City and directed him through the Deep Creek area and onto a gravel road.

Upon stopping on the gravel road, Roach picked up Seay, who was still passed out in the backseat, and carried her into the woods. Roach then set Seay down in a small creek, and the cold water awakened her. Slee saw Seay stand up, then, when he was not looking, heard her scream. Slee turned back and saw Seay fall back to the ground. As Seay was trying to get up, Slee saw Roach "fiddling with something in his waistband." He then saw Roach shoot Seay. Slee ran to his car, but turned around and observed Roach walking towards Seay and pointing the revolver at her as she was lying on her back. As he was getting into his car, Slee heard a second shot. When Roach entered the car, he told Slee to drive to Squirrel's residence. Upon arriving, Slee confirmed to Squirrel that Roach had shot Seay.

Roach gave Slee money that night to keep quiet about the shooting and later provided him with cocaine as a further

inducement. Roach instructed Slee to tell only the "silver car" story. Slee also identified the revolver in police custody as the weapon used to shoot Seay.

Roach was the last defendant to be interviewed by the FBI agents. After initially denying his involvement, he recanted and admitted to shooting Seay. Roach said that he shot Seay because she had been stealing drugs from him for the past year. Roach admitted to having sex with Seay at Big Dave's home, but claimed it was consensual. Roach said that, after leaving Big Dave's home, he met up with Slee, who offered to give him a ride home. Once they received word that Big Dave wanted them to pick up Seay, they returned to Big Dave's home and picked up Seay.

Once in the car, Roach said he wanted to meet someone in the Deep Creek area of the national park to buy some drugs. Upon reaching the gravel road, Roach carried Seay out of the car and into the woods. Roach stated that Seay woke up in the woods and began to say she "would have some drugs when they arrived." Roach told her she "would not get any," and in response, Seay attempted to grab him. After pushing her away, Seay attempted to grab Roach again. It was during this time that Roach stated he decided to kill Seay.

Roach pushed Seay to the ground, with her falling flat on her back. He encountered a problem with his revolver as he tried to shoot Seay, describing that he had to open the wheel of the revolver to determine whether the wheel spun to the right or to the left, and had to line up a bullet so that when he closed the wheel of the revolver it would spin in the correct direction to fire. He stated he only had three or four bullets in the revolver. Roach was approximately eight to ten feet from Seay when he shot her the first time as she was beginning to stand. She fell backwards, flat onto her back, and he heard her moan. He decided to shoot her again and opened the wheel of the gun to load a "good" bullet from his pocket. Roach loaded the bullet into the wheel of the revolver and ori-

ented the wheel so it would fire correctly. Roach shut the wheel of the revolver and fired a second shot into Seay. Roach said he could not leave anyone in that much pain, so "I just made sure."

After shooting Seay, Roach returned to Slee's car and described reloading the revolver and taking out two spent shell casings. Roach recounted the remaining events as described above (returning to Squirrel's residence, telling him he shot Seay, and giving the gun to Squirrel), adding that he threw the two spent casings out of the window on his way to Squirrel's home. The .38 caliber revolver in police custody was identified by Roach as the weapon he used to kill Seay.

The district court conducted Squirrel's sentencing hearing on June 7, 2007, Slee's on June 18, 2007, and Roach's on August 31, 2007. Each defendant stipulated that the facts set forth in the PSR provided a factual basis to support his respective guilty plea. These stipulations allowed the district court to adopt the findings in the PSRs for purposes of sentencing. The district court sentenced Squirrel to seventy months' imprisonment; Slee to fifty-seven months' imprisonment; and Roach to two consecutive life terms. The district court also ordered that each defendant be jointly and severally liable for restitution in the amount of $5,645.00 for necessary funeral and related expenses, but directed that the following paragraph be added to each judgment:

> This restitution does not include restitution which the court will order paid for the use and benefit of [Jailyn] Byrd, infant daughter of the deceased murder victim. The amount and schedule for payment of same will be determined by the Court after considering a recommended report to be filed by the U.S. Probation Office within the next ninety (90) days. The Probation Officer will contact Tribal Authorities, defense counsel for the three (3) co-defendants and the U.S. Attorney for recommendations.

On October 24, 2007, a United States Probation Officer filed a "Memorandum" and "Supplement to the Presentence Report." Attached to that supplement were the parties' respective positions regarding restitution for the benefit and use of Seay's infant child.

The district court held a hearing regarding restitution on November 19, 2007. On January 16, 2008, the district court issued an order amending the judgment of all three defendants to mandate that, in addition to the $5,645.00 restitution figure, each were jointly and severally liable for restitution to Seay's estate in the amount of $1,459,854.22. Using a remaining life expectancy of fifty-nine years, the district court based this $1,459,854.22 figure on: (1) lost per capita income to which Seay was entitled as a member of the Tribe; and (2) Seay's estimated lost future earnings.[4]

Each defendant filed a timely notice of appeal from his respective amended judgment. The defendants filed a combined brief, raising the following four arguments challenging the $1,459,854.22 restitution award: (I) the $1,459,854.22 restitution award as to all three defendants was unlawful because it was speculative; (II) the district court erred in finding that Fourth Circuit jurisprudence sufficiently allowed for the imposition of the $1,459,854.22 restitution award against Squirrel and Slee in their capacities as accessories-after-the-fact to Roach's murder of Seay; (III) the district court erred when it found that the plea agreements of Squirrel and Slee allowed for the imposition of the $1,459,854.22 restitution award; and (IV) the provisions of the Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. §§ 3663A-3664,

---

[4]As an enrolled member of the Tribe, Seay received two per capita payments each year from gaming revenues generated by the Tribe, one in June and the other in December, and would have received such payments for the remainder of her life.

which allows the district court to determine restitution, violates Roach's Seventh Amendment right to trial by jury.[5]

The government moved to dismiss the entire appeal, based on the appeal waiver provisions in each plea agreement. On December 9, 2008, we granted the government's motion in part and denied it in part. Specifically, we held that Arguments I and IV fell within the scope of the appeal waivers, but that Arguments II and III did not. Accordingly, we dismissed the appeal with respect to Arguments I and IV, but denied the government's motion with respect to Arguments II and III. Thus, Arguments II and III are before us in the present appeal.[6]

II

Squirrel and Slee argue that the district court erred when it found them jointly and severally liable for additional restitution to the Seay's estate in the amount of $1,459,854.22. Before addressing the specifics of this argument, it is helpful to set forth the relevant provisions of the MVRA, the current state of our case law concerning under what circumstances an order of restitution under the MVRA is appropriate when the underlying offense is for accessory-after-the-fact, and the reasoning offered by the district court in support of its decision.

A

1

The MVRA provides that for crimes of violence, certain offenses against property, and crimes related to tampering with consumer products due to which a victim has suffered either a physical or pecuniary loss, "the court shall order, in

---

[5]In this appeal, there is no challenge to the restitution award of $5,645.00 imposed by the district court.

[6]Because Arguments II and III only concern Slee and Squirrel, Roach's appeal was dismissed.

addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate." 18 U.S.C. § 3663A(a)(1).[7] The MVRA defines a victim as

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

*Id.* § 3663A(a)(2).[8]

An order of restitution under the MVRA or the VWPA is issued and enforced in accordance with 18 U.S.C. § 3664, which sets forth the procedures for calculating and ordering restitution. *Id.* § 3663A(d). Section 3664(f)(1)(A) provides that "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A). "We . . . have interpreted this language to require that an order of restitution be based on 'actual loss,' rather than 'intended loss.'" *Harvey*, 532 F.3d at 339. However, in cases involving multiple defendants, 18 U.S.C. § 3664(h) explicitly gives a district court discretion as to whether joint and several liability should apply or whether liability should be apportioned among the defendants based on their economic circumstances and their respective contri-

---

[7]In contrast to the MVRA, the Victim and Witness Protection Act (VWPA) "permits, but does not require, a court to order restitution when there is an identifiable victim." *United States v. Harvey*, 532 F.3d 326, 339 (4th Cir. 2008).

[8]The government apparently concedes, correctly in our view, that the accessory-after-the-fact offenses in this case do not have as an element a scheme, conspiracy, or pattern of criminal activity.

butions to the victim's losses.[9] Finally, under the MVRA, a district court must "order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." *Id.* § 3663A(a)(3).

The government bears the burden of demonstrating by a preponderance of the evidence the amount of actual loss sustained by the victim. *id.* § 3664(e); *Harvey*, 532 F.3d at 340. In determining the amount of actual loss for purposes of imposing restitution under the MVRA, the district court is the trier of fact. *United States v. Davenport*, 445 F.3d 366, 373 (4th Cir. 2006); *United States v. Dawkins*, 202 F.3d 711, 716 (4th Cir. 2000).

2

Although there is no published Fourth Circuit case addressing the issue of whether an order of restitution under the MVRA is appropriate when the underlying offense is for accessory-after-the-fact, one unpublished Fourth Circuit case exists, on which the district court relied in holding Squirrel and Slee jointly and severally liable with Roach for the full amount of Seay's lost future income from the Tribe and her lost future wages. The case is *United States v. Quackenbush*, 9 Fed. Appx. 264, 2001 WL 574649 (4th Cir. May 29, 2001) (*per curiam*) (unpublished).

In that case, Daniel Quackenbush was convicted of being an accessory-after-the-fact to a bank robbery after he assisted

---

[9]Section 3664(h) provides:

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and [the] economic circumstances of each defendant.

18 U.S.C. § 3664(h).

three bank robbers, post-robbery, by driving them to and from various locations, harboring them, and helping them travel and spend the proceeds of the robbery. *Id.* at *1. Quackenbush was also convicted of possessing $1,000.00 or less of stolen bank money. *Id.* at *1 n.1. The district court held Quackenbush jointly and severally liable under the MVRA for restitution in the amount of $26,343.99 based upon the losses to the bank ($22,681.53), a pre-robbery carjacking victim ($952.86), and the carjacking victim's insurers ($849.89 and $1,859.71). *Id.* at *1.

On appeal, Quackenbush conceded that his possession of stolen bank money conviction allowed the district court to impose restitution for that conviction, but not in an amount that exceeded $1,000.00. *Id.* at *2 n.3. Moreover, we agreed with the government's concession that the portion of the district court's restitution order which held Quackenbush jointly and severally liable for restitution to the pre-robbery carjacking victim and the carjacking victim's insurers could not be sustained because "the losses to those victims were not linked to Quackenbush's offenses." *Id.* at *2 n.2 (citation and internal quotation marks omitted). Accordingly, the bulk of our opinion addressed only the question of "whether the district court erred in imposing restitution against Quackenbush in the full amount of the bank's losses where the basis for Quackenbush's conviction was his conduct as an accessory-after-the-fact." *Id.* at *2.

In addressing this question, we first agreed with the government that there is no *per se* rule against imposing restitution on persons based on their convictions for being accessories-after-the-fact. *Id.* at *3. Next, we identified the "relevant question" under the MVRA as

> whether the victims' losses were proximately caused by the specific conduct for which Quackenbush was convicted, *i.e.*, being an accessory-after-the-fact by virtue of his acts of driving the bank robbers to and

from various locations following the bank robbery, harboring them, helping them count and spend the money, and helping them hide from the police.

*Id.* We upheld Quackenbush's joint and several liability to the bank on the basis that "the district court very well could have found that the bank's inability to recover the stolen money was directly attributable to Quackenbush's act of helping the bank robbers hide after the robbery." *Id.* at *4. In other words, unlike the pre-robbery carjacking victim and the carjacking victim's insurers, there was a direct causal link between Quackenbush's offense conduct as an accessory-after-the-fact and the bank's losses.

3

In the case presently before us, the district court provided alternative bases to hold Squirrel and Slee jointly and severally liable to Seay's estate for Seay's lost future income from the Tribe and her lost future wages. First, the district court relied on *Quackenbush*, reasoning as follows:

The facts here are similar to those in *Quackenbush*. Although Slee did not plan or actively participate in Seay's murder, he did witness Roach shoot and kill her and then drove Roach from the murder scene. Slee PSR, *supra*, at 6. He also received money and drugs from Roach as inducements to keep quiet about the murder. *Id.* Roach admitted to Squirrel that he murdered Seay and ordered Squirrel to take the murder weapon and get rid of it; Squirrel complied. *Id.* at 5. Squirrel threw the gun into the woods that night, recovered it the next morning, and then gave it to another person to hold for him. *Id.* Both Slee and Squirrel joined Roach in the fabricated story that Seay was last seen getting into a silver car with an unknown male. *Id.* at 5-6. These actions of Slee and Squirrel deliberately obstructed the murder investi-

gation by authorities and delayed the apprehension of Roach. The Court, therefore, finds that Slee and Squirrel, as accessories, are liable for full restitution to Seay's estate under the MVRA.

Second, and in the alternative, the district court relied upon Squirrel's and Slee's plea agreements as a basis for its decision. According to the district court, because both Squirrel and Slee agreed in their respective plea agreement that the district court could in its discretion order restitution, they understood that any restitution order could cover liability to Seay's estate for her lost future income from the Tribe and her lost future wages.

B

With regard to the district court's interpretation of *Quackenbush*, Squirrel and Slee contend that the district court's interpretation is faulty because none of their offense conduct "contributed to or exacerbated any lost income that might potentially have been earned by the victim had she not been killed by Defendant Roach." Appellants' Br. at 28. In so contending, Squirrel and Slee distinguish *Quackenbush* on the facts. In *Quackenbush*, there was evidence from which the district court could have found that Quackenbush's offense conduct contributed to the bank's losses by hindering law enforcement efforts to recover the money taken during the robbery, while in the present case there is no evidence to even suggest that Squirrel's and Slee's conduct as accessories-after-the-fact caused the financial losses to Seay's estate to be any greater than they already were as the result of Seay's murder. Squirrel and Slee reason that any delay they caused in the recovery of Seay's body or the murder weapon, or in the apprehension of Roach did not add one dime to the financial loss suffered by Seay's estate due to her lost future income from the Tribe or her lost future wages.

In response, the government concedes that only Roach caused the murder of Seay, and that "[n]either Squirrel nor

Slee directly caused her to be 'more dead' than she already was." Appellee's Br. at 4. Nonetheless, the government argues, like Quackenbush, Squirrel and Slee impeded law enforcement from seeking Seay's killer and attempted to help such killer escape apprehension, and therefore, are each jointly and severally liable under the MVRA for the full financial loss to Seay's estate caused by her death.

According to the government, Squirrel impeded law enforcement by throwing the murder weapon into the woods overnight, retrieving it the next day, and giving it to a third party for safekeeping from law enforcement. Additionally, the government states that Squirrel impeded law enforcement by propagating the false silver car story. The government argues that Slee went even further than Squirrel, in that he not only aided in the escape phase of Roach's crime, but also transported the victim and her murderer to the murder site. Simply put, the government argues that the bank loss facts in *Quackenbush* are similar to the facts in the present case and demonstrate that restitution can, and should, be ordered where defendants are convicted of being an accessory-after-the-fact and where their actions further the underlying criminal activity.

Unfortunately for the government, the facts of this case simply do not line up with the bank loss facts in *Quackenbush*, because Squirrel's and Slee's respective criminal activity occurred after Seay's murder, not before, and because their criminal activity, unlike Quackenbush's (which did increase the financial harm to the bank), did nothing to cause or increase the financial harm to Seay's estate.[10]

---

[10]The government argues that Slee's criminal activity began *before* Seay's murder, in that on the way to the Deep Creek area "Roach told [Slee] he planned to kill Ms. Seay," Roach "showed Slee the gun he intended to use," and nevertheless Slee continued to drive to the area "at Roach's direction." Appellee's Br. at 5. We reject this argument. First, the argument is inconsistent with the government's position at sentencing that

To be sure, the MVRA, its legislative history, and our case law make clear that, unless a plea agreement provides otherwise (an issue we discuss in Part II(C) of this opinion), an order of restitution under the MVRA is to be based upon the loss directly and proximately caused by the defendant's offense conduct. 18 U.S.C. § 3663A(a)(1)-(2); S. Rep. No. 104-179, at 19, *reprinted in* 1996 U.S.C.C.A.N. 924, 932 (Judiciary Committee Report on MVRA explaining that, unless a plea agreement provides otherwise, the "mandatory restitution provisions apply only in those instances where a named, identifiable victim suffers a physical injury or pecuniary loss directly and proximately caused by the course of conduct under the count or counts for which the offender is convicted"); *see also Hughey v. United States*, 495 U.S. 411, 413 (1990) (holding that under identical language in the VWPA, district court is authorized to make "an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction"), *superseded by statute on other grounds*, 18 U.S.C. §§ 3663(a)(2), 3663A(a)(2); *United States v. Newsome*, 322 F.3d 328, 341 (4th Cir. 2003) ("[T]he focus of the court in applying the MVRA must be on the losses to the victim caused by the offense."); *United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996) ("For a person to be considered a victim under the [VWPA], the act that harms the individual must be either conduct underlying an element of the offense of conviction, or an act taken in furtherance of a scheme, conspiracy, or pattern of criminal activity that is specifically included as an element of the offense of conviction.").

Here, neither Squirrel's nor Slee's offense conduct as an

---

Slee had no criminal culpability prior to Seay's murder. Second, there simply is no evidence in the record to support a finding that Slee knew that Roach intended to murder Seay, and indeed, the district court never made a finding to this effect, either independently or through its adoption of the PSRs.

accessory-after-the-fact to Roach's murder of Seay directly or proximately caused any financial loss to Seay's estate.[11] Indeed, the district court as the trier of fact regarding the underlying facts in determining if Squirrel and/or Slee should be ordered to pay restitution to Seay's estate found that neither Squirrel nor Slee planned or actively participated in Seay's murder. Moreover, the facts set forth in Squirrel's and Slee's PSRs, which the district court adopted as the factual bases for their respective pleas of guilty to being accessories-after-the-fact, did not contain any facts to the effect that Squirrel or Slee planned or knowingly participated in Seay's murder. Notably, while the district court expressly found that Squirrel's and Slee's offense conduct deliberately obstructed the murder investigation by law enforcement authorities and delayed the apprehension of Roach, the district court never made a finding that Squirrel's or Slee's offense conduct directly and proximately caused loss to Seay's estate, understandably because Squirrel's and Slee's criminal activity occurred after Seay's murder, not before. In sum, the district court erred in holding Squirrel and Slee jointly and severally liable to Seay's estate under the MVRA for her lost future income from the Tribe and her lost future wages. *See Davenport*, 445 F.3d at 374 (in case where defendant pleaded guilty to credit card fraud, vacating restitution order under the MVRA because it required defendant to pay sums to persons whose credit cards were stolen, but who did not suffer actual loss as the direct and proximate cause of defendant's offense conduct; only the credit card company or companies liable for the fraudulent charges made were directly harmed by the offense conduct).

---

[11]We are only concerned here with conduct underlying the elements of an accessory-after-the-fact to first-degree murder offense. As noted *supra* in Footnote 8, such an offense does not involve acts taken in furtherance of a scheme, conspiracy, or pattern of criminal activity.

C

Squirrel and Slee also challenge the district court's reliance upon their respective plea agreements as an alternative basis for its restitution order holding them jointly and severally liable to Seay's estate for her lost future income from the Tribe and her lost future wages.

In Squirrel's and Slee's respective plea agreements, each agreed to:

> pay full restitution, regardless of the resulting loss amount, which restitution will be included in the Court's Order of Judgment. The defendant agrees that such restitution will include all victims directly or indirectly harmed by the defendant's "relevant conduct," including conduct pertaining to any dismissed counts or uncharged conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. § 3663 or 3663A.

Section 1B1.3 of the Sentencing Guidelines defines "relevant conduct" as:

> **(1)(A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> **(B)** in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

*U.S. Sentencing Guidelines Manual* § 1B1.3(a)(1)(A)-(B).

In its decision, the district court stated that during the Rule 11 plea hearing before the magistrate judge, Squirrel and Slee specifically understood that, in their respective plea agreements, they each agreed that "in the Court's discretion, restitution may be ordered paid to any victim of the offense." With essentially no analysis, the district court then held that Squirrel and Slee "are bound by the terms of their respective plea agreements to pay restitution under the MVRA." With these observations, the district court held Squirrel's and Slee's plea agreements provided an alternative basis to support its decision holding them jointly and severally liable to Seay's estate for her lost future income from the Tribe and her lost future wages.

In *United States v. Jordan*, 509 F.3d 191 (4th Cir. 2007), we summarized Fourth Circuit law regarding how we interpret plea agreements in the context of our *de novo* review of the district court's interpretation of a plea agreement:

> In interpreting plea agreements, we draw upon contract law as a guide to ensure that each party receives the benefit of the bargain. Applying standard contract law, we enforce a plea agreement's plain language in its ordinary sense, and do not write the contracts of the parties retroactively, but merely construe the terms of the contract the parties have previously signed. Whether a written agreement is ambiguous or unambiguous on its face should ordinarily be decided by the courts as a matter of law. If the plea agreement is unambiguous as a matter of law, and there is no evidence of governmental over-

> reaching, we should interpret and enforce the agreement accordingly.
>
> Because a defendant's fundamental and constitutional rights are implicated when he is induced to plead guilty by reason of a plea agreement, we analyze a plea agreement with greater scrutiny than we would apply to a commercial contract. We thus hold the Government to a greater degree of responsibility than the defendant for imprecisions or ambiguities in plea agreements.

*Id.* at 195-96 (internal quotation marks, citations, ellipses, and alteration marks omitted).

Squirrel and Slee acknowledge that the MVRA permits a plea agreement to broaden the scope of a defendant's conduct which would subject him to an order of restitution, *see* 18 U.S.C. § 3663A(a)(3) (providing that a district court must "order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense"), but contend that the restitution provision contained in their respective plea agreements in no way, shape, or form supports the district court's order that they each are jointly and severally liable to Seay's estate for her lost future income from the Tribe and her lost future wages. In this regard, Squirrel and Slee rely, in part, upon the same causation analysis as they offer in support of their position in Part II(B) of this opinion. Additionally, they point out that at the restitution hearing, the government told the district court:

> I'll be honest with you, it hadn't even occurred to me to ask for this amount of restitution when engaging in the plea discussions, and certainly not engaging in the charges. I was waiting for the presentence report, just like everybody else, and was expecting it to cover minimal expenses. It was the Court that asked us to engage in this exercise. And upon looking at

the case law and the statutes, I think not only is the
Court right to do this, but I actually need to be doing
this in future cases.

So this is not an issue that was raised by the govern-
ment. The court raised it at the outset.

In response to Squirrel and Slee's argument, the govern-
ment first asserts that its admission at the restitution hearing
that it did not originally think to request restitution be paid to
Seay's estate is irrelevant to the question of whether Squirrel
and Slee are obligated under the MVRA and their respective
plea agreements to pay restitution to Seay's estate. Second,
the government asserts that "[c]ertainly the decedent, and thus
her estate, was the victim directly harmed by defendants' con-
duct." Appellee's Br. at 9.

In our view, the district court's reliance on the plea agree-
ments in ordering Squirrel and Slee to pay the additional resti-
tution fares no better than its reliance on the MVRA alone.
The one distinction between the MVRA and the restitution
provided in the plea agreements is that the MVRA does not
permit reliance on a defendant's relevant conduct for purposes
of a causation analysis. Here, the distinction is without a dif-
ference, because even considering the broader scope of con-
duct that may be considered under the definition of relevant
conduct as set forth in the Sentencing Guidelines, the conduct
of Squirrel and Slee did not directly and proximately cause
any financial loss to Seay's estate. No acts and omissions
committed, aided, abetted, counseled, commanded, induced,
procured, or willfully caused by Squirrel or Slee that occurred
during the commission of their respective accessory-after-the-
fact offenses, in preparation for that offense, or in the course
of attempting to avoid detection or responsibility for that
offense can reasonably be said to have directly and proxi-
mately caused financial loss to Seay's estate.

In sum, the restitution paragraphs in Squirrel's and Slee's
respective plea agreements do not provide a valid basis for the

district court's decision holding Squirrel and Slee jointly and severally liable to Seay's estate in the additional amount of $1,459,854.22.

## III

For the reasons stated herein, we vacate the appellants' judgments and remand with instructions to amend their respective judgments by deleting the award of additional restitution in the amount of $1,459,854.22.

*VACATED AND REMANDED*