In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-1265, 09-1287, 09-1376,
09-1602, 09-2093, 09-2109

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PAUL SCHIRO, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 02 CR 1050-7, -4, -3, -2, -10—**James B. Zagel**, *Judge.*

ARGUED FEBRUARY 13, 2012—DECIDED MAY 1, 2012

Before POSNER, WOOD, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* This long-running criminal case is before us for the second time. In the first appeal, decided in *United States v. Calabrese*, 490 F.3d 575 (7th Cir. 2007), two defendants, Frank J. Calabrese, Sr., and James Marcello, charged with violating RICO by conspiring to conduct an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(d), appealed from the

denial of their motions to dismiss the indictment. The indictment charged them, along with other members of the "Chicago Outfit"—the long-running lineal descendant of Al Capone's gang—with having conducted the Outfit's affairs through a pattern of racketeering activity that extended from the 1960s to 2005 and included a number of murders, along with extortion, obstruction of justice, and other crimes. Calabrese and Marcello contended that the trial, which was scheduled to begin on June 19, 2007, would place them in double jeopardy, and so they moved the district court to dismiss the charges. We affirmed the denial of their motions, holding that they had failed to show a sufficient overlap between the current indictment and previous indictments to establish that the new prosecution was placing them in double jeopardy, though we noted that, depending on the approach taken by the government in the forthcoming trial, the trial might vindicate their claim. *United States v. Calabrese, supra*, 490 F.3d at 580-81.

So they were tried, together with three other members of the Outfit—Joseph Lombardo, Paul Schiro, and Anthony Doyle. The trial lasted almost three months, and resulted in the conviction of all five defendants by the jury. The judge sentenced Calabrese, Marcello, and Lombardo to life in prison, Schiro to 20 years, and Doyle to 12 years, and also imposed forfeiture and restitution on all the defendants. All five defendants appeal. The most substantial claims are renewed claims of double jeopardy by Calabrese and Marcello, and we begin there.

The Outfit conducts its operations in Chicago through "street crews." Calabrese was the boss of the Calabrese Street Crew (also known as the South Side/26th Street Crew). Marcello was a member of the Carlisi Street Crew (also known as the Melrose Park Crew). Marcello had been indicted in 1992 along with eight others for conspiring, in violation of RICO, to conduct the affairs of the Carlisi Street Crew by means of a variety of criminal acts committed between 1979 and 1990, including the operation of an illegal gambling business, extortion, intimidation, conspiracy to commit arson and murder, and the collection of unlawful gambling debts. He had been convicted in 1993 and sentenced to 150 months in prison, and his conviction and sentence had been affirmed in *United States v. Zizzo*, 120 F.3d 1338 (7th Cir. 1997). Calabrese had been charged in 1995 with participation in a similar conspiracy, though the offense period was 1978 through 1992. He had pleaded guilty in 1997 and been sentenced to 118 months in prison. He had not appealed.

Double jeopardy can take two forms. One is prosecution for a crime the elements of which overlap the elements of a crime involving the same facts for which the defendant had been prosecuted previously. And in such a case, a case "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304 (1932); see also *United States v. Dixon,* 509 U.S. 688,

696 (1993); *United States v. Doyle*, 121 F.3d 1078, 1089-90 (7th Cir. 1997). For example, there would be only one offense for purposes of assessing double jeopardy if the second prosecution was for a lesser included offense of the crime for which the defendant had been prosecuted the first time. The other form of double jeopardy is prosecuting a person a second or subsequent time for the same offense, and that can be a difficult determination to make when the offense is conspiracy. *Id*.; *United States v. Calabrese*, *supra*, 490 F.3d at 578. Heraclitus famously said that one never steps into the same river twice. What he meant was that one never steps into the same water; the river is the same, even though its substance is always changing. And so a conspiracy can be the same even if all the acts committed pursuant to it are different, because it is the terms of the agreement rather than the details of implementation that determine its boundaries.

Both the earlier and the current indictments of Calabrese and Marcello charge a RICO conspiracy—an "agreement . . . to knowingly facilitate the activities of the operators or managers" of an enterprise that commits crimes that are on a list (in the RICO statute) captioned "racketeering activity." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000); see 18 U.S.C. §§ 1961(1), 1962(d); *United States v. Pizzonia*, 577 F.3d 455, 466 (2d Cir. 2009). The question is whether the second conspiracy is the same conspiracy. That's a harder question than whether two criminal statutes have the

same elements, or whether an indictment for robbery charges the same robbery as a previous indictment.

The earlier and later conspiracies that Calabrese and Marcello were charged with overlapped. The crimes they were accused of agreeing to commit included some that had been alleged in the earlier indictments (the same crimes but different criminal acts) but other crimes as well, crimes with which they had not been charged previously, including murders (particularly emphasized in the current indictments) and travel in interstate commerce in pursuit of the Outfit's criminal objectives. Calabrese and Marcello argue that their agreement to facilitate the criminal activities of their street crews and their agreement to facilitate the criminal activities of the Outfit itself are one and the same because the street crews are components of the Outfit.

To evaluate the argument we need to distinguish between two situations. In one a defendant initially is prosecuted for his involvement in a component organization and later for his involvement in the parent organization—of which he is a member simply by virtue of having joined one of the component organizations. In the other a defendant is prosecuted successively for joining a parent and one of its component organizations that he serves in different ways.

A worker at Ford Motor Company's River Rouge Complex is an employee of Ford Motor Company. His agreement to work on the River Rouge assembly line contributes both to the plant's output and to the output of

the company as a whole, of which River Rouge's output is simply a part. If Ford produced sawed-off shotguns rather than automobiles, the worker could be prosecuted for conspiring with employees of Ford or employees at the River Rouge plant to produce an illegal weapon, but he could not be prosecuted for two separate conspiracies, because the members and the objectives and the activities of the two conspiracies (conspiracy with employees of Ford, conspiracy with employees at River Rouge) would be identical.

But if after producing sawed-off shotguns in the River Rouge plant an employee who had worked there is promoted into the Ford executive suite in Detroit as a regional manager and while there prepares financial reports designed to conceal from the government Ford's income from the production of illegal weaponry at River Rouge and other Ford plants, he has joined a separate though overlapping conspiracy.

We see from this example that depending on what the employee does, there can be two different enterprises that he is assisting rather than one even though they are affiliated, and provided that either they are indeed different (as in our example) or the patterns of racketeering activity are different (in other than small ways, *United States v. Calabrese*, *supra*, 490 F.3d at 580-81; see also *United States v. Pizzonia*, *supra*, 577 F.3d at 464-65; *United States v. Ciancaglini*, 858 F.2d 923, 930 (3d Cir. 1988), which would suggest that the government was trying to take two bites of what was really just one apple), there is no

double jeopardy. *United States v. DeCologero*, 364 F.3d 12, 18-19 (1st Cir. 2004). The Outfit and its subsidiary street crews are different though overlapping enterprises pursuing different though overlapping patterns of racketeering. And so they can be prosecuted separately without encountering the bar of double jeopardy. *United States v. Pizzonia*, *supra*, 577 F.3d at 463-64; *United States v. Wheeler*, 535 F.3d 446, 453-54 (6th Cir. 2008); *United States v. DeCologero*, *supra*, 364 F.3d at 18-19.

If as in our first Ford hypothetical you do street crew business only, you are not working for two different enterprises even though the street crew is a branch; the enterprises are no more different than two nested Russian dolls are. But if you murder, which is Outfit business because it is too sensitive to be left to the street crews, you are working for the Outfit in a respect that is different from your street crew work; you are demonstrating that your agreement to assist the Outfit is broader than and distinct from your agreement to assist your street crew, just as conspiring to assemble shotguns at a plant is different from conspiring to conceal the assembly of shotguns at numerous plants.

The street crews (six in number in the relevant period) are operating divisions of the Outfit in Chicago. But the Outfit has powers and responsibilities distinct from those of the street crews. Only the Outfit can approve murders. Murders, or at least the kind of murders that the Outfit commits, generate no revenue directly. The benefits they confer, notably reducing the risk of appre-

hension and conviction by eliminating informants and imposing discipline on members, accrue to the entire organization. Only the Outfit can form ad hoc groups whose members are drawn from two or more street crews to perform special tasks, such as surveillance of a person whom the Outfit's leadership has decided should be murdered. Only the Outfit can authoritatively resolve disagreements between street crews. And only the Outfit has a financial stake in Las Vegas. A member of a street crew is a member of the Outfit, but as in our second Ford example these are separate enterprises despite their affiliation. *United States v. Calabrese, supra*, 490 F.3d at 578; cf. *United States v. DeCologero, supra*, 364 F.3d at 17-18; *United States v. Langella*, 804 F.2d 185, 188-89 (2d Cir. 1986). One enterprise (the Outfit) coordinates the Chicago mob, and commits crimes such as witness tampering and obstruction of justice to minimize government intrusion into the affairs of the entire mob; the other focuses on street-level vice.

The present indictment, and the evidence presented at trial to prove its allegations, concerns conspiracies involving Calabrese and Marcello in their capacity as Outfit members, not as street crew members. In particular, they conspired to commit murder, and did commit murder, as members of the Outfit, not as members of street crews. One of the murder conspiracies in which they were involved was intended to protect the Outfit's interest in Las Vegas casinos. There was no Las Vegas street crew, though of course members of the Outfit

oversaw the Outfit's skim of Las Vegas casino profits. The Outfit is more than the sum of the street crews.

All this would be obvious if the Chicago Outfit were a corporation and the street crews were subsidiaries. But it would be beyond paradoxical if by virtue of being forbidden by law to form subsidiaries, employees of criminal enterprises obtained broader rights under the double jeopardy clause than the employees of legal ones.

There is overlap as we said between the successive prosecutions, especially with regard to the types of street-level vice charged in previous indictments. But after we warned in our previous decision that if the government's evidence at the trial of the present case (which remember was about to start when we rendered that decision) duplicated its evidence in the previous trials of Calabrese and Marcello, the defendants might be able to plead double jeopardy successfully, *United States v. Calabrese, supra*, 490 F.3d at 580-81; cf. *United States v. Laguna-Estela*, 394 F.3d 54, 58-59 (1st Cir. 2005); *United States v. Solano*, 605 F.2d 1141, 1145 (9th Cir. 1979), the government took pains to present evidence in the current trial of conduct that had not figured in the previous ones and that distinguished the scope of the Outfit conspiracy from that of the street crew conspiracies. We did not think that the defendants had proved double jeopardy from a comparison of indictments, and their claim is even weaker now that the second trial has been conducted. We can't say that the "government contrived the differences to evade the prohibition against

placing a person in double jeopardy." *United States v. Calabrese*, *supra*, 490 F.3d at 580. The present trial substantiated the functional differences between the Outfit and the street crews that show that these are different criminal enterprises, with different functions that generate different though overlapping patterns of racketeering activity. *United States v. Langella*, *supra*, 804 F.2d at 188-89.

But the means by which the government has thwarted the double jeopardy defense raises the question whether the defendants may have a good defense of statute of limitations. The murders that the Outfit orchestrated are the best evidence that the Outfit conspiracy was different from the street crew conspiracies for which Calabrese and Marcello had already been placed in jeopardy. But the last Outfit murder charged, that of John Fecarotta, was committed in 1986, 19 years before the present indictment and therefore well outside the 5-year statute of limitations for RICO offenses. That is the default federal statute of limitations when a criminal statute fails to specify a statute of limitations, 18 U.S.C. § 3282; *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 155-56 (1987), and RICO is such a statute.

Marcello's operation of illegal gambling machines and Calabrese's participation in street-tax collection (despite his being in prison) persisted into the statutory period, but those are street-crew activities rather than Outfit activities. But a statute of limitations for conspiracy does not begin to run until the conspiracy ends,

*United States v. Yashar*, 166 F.3d 873, 875-76 and n. 1 (7th Cir. 1999); *United States v. Maloney*, 71 F.3d 645, 659-61 (7th Cir. 1995); *United States v. Yannotti*, 541 F.3d 112, 123 (2d Cir. 2008), and the separate conspiracy involving the Outfit continued into the statutory period, even if no predicate acts (crimes that constitute a pattern of racketeering activity) were committed during that period. But some were—namely, as the district judge found, obstructions by Calabrese and Marcello of the government's investigation of the Outfit.

There is another statute of limitations issue. Joseph Lombardo argues that he withdrew from the conspiracy in 1992, which if true means that the five-year statute of limitations had run by the time he was indicted in 2005. The principal evidence of withdrawal was an announcement that he placed in the *Chicago Tribune* and two other Chicago newspapers in which he said he'd just been released from federal prison on parole and that "if anyone hears my name used in connection with any criminal activity please notify the F.B.I., local police and my parole officer, Ron Kumke." The government describes the announcement as a "stunt," but whatever it was, it was not effective withdrawal.

One cannot avoid liability for conspiracy simply by ceasing to participate, *United States v. Bafia*, 949 F.2d 1465, 1477 (7th Cir. 1991); *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964) (Friendly, J.), hoping the conspiracy will continue undetected long enough to enable the statute of limitations to be pleaded suc-

cessfully when one is finally prosecuted, the conspiracy having at last been detected. It is true that although the best evidence of withdrawal is reporting the conspiracy to the authorities with sufficient particularity to facilitate their efforts to thwart and prosecute it, *United States v. Wilson*, 134 F.3d 855, 863 (7th Cir. 1998); *United States v. Patel*, 879 F.2d 292, 294 (7th Cir. 1989); *United States v. Randall*, 661 F.3d 1291, 1294-95 (10th Cir. 2011), a number of cases hold that an unequivocal statement of resignation communicated to one's conspirators can also constitute withdrawal. E.g., *United States v. Arias*, 431 F.3d 1327, 1341 (11th Cir. 2005); *United States v. Greenfield*, 44 F.3d 1141, 1149-50 (2d Cir. 1995). The rationale is that "by communicating his withdrawal to the other members of the conspiracy, a conspirator might so weaken the conspiracy, or so frighten his conspirators with the prospect that he might go to the authorities in an effort to reduce his own liability, as to undermine the conspiracy." *United States v. Paladino*, 401 F.3d 471, 479-80 (7th Cir. 2005). This implies that a public announcement that is certain to be seen by one's coconspirators could do the trick, though we can't find any examples. No matter; Lombardo asked for a jury instruction on withdrawal and his request was granted. Doubtless the jury agreed with the prosecution that the *Tribune* ad was a stunt; and its rejection of the claim of withdrawal was reasonable and therefore binds us.

Marcello raises an evidentiary issue. A victim's daughter identified Marcello's voice as that of the man who called her father on the day of the father's disappearance. Mar-

cello wanted to present an expert witness who would testify that voice identifications are often mistaken. The judge excluded the evidence. He was skeptical about its empirical basis and also thought that the jury already had a good understanding of the fallibility of "earwitness" identification. We do not suggest that such expert evidence is worthless or that jurors always grasp the risk of misidentification inherent in eyewitness and earwitness testimony. But a trial judge has a responsibility to screen expert evidence for reliability and to determine the total effects of proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury. See Fed. R. Evid. 403. Both reliability and potential for confusion were factors in this case and we cannot say the judge abused his discretion in refusing to admit the expert evidence, which the jury might have taken as a signal that it should disregard the witness's identification testimony. See *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009). If jurors are told merely that voice identifications frequently are mistaken, what are they to do with this information? The defendant's lawyer will argue mistaken identification and jurors told that such mistakes are common may be afraid to make their own judgment.

We turn now to issues involving the district judge's dealings with the jury. Most of the defendants' complaints about those dealings have no merit. They complain about his occasional discussions with jurors in the jury room but those discussions appear to have been limited to matters of scheduling, which being unrelated to the merits of the prosecution do not provide a ground for

a new trial. *Rushen v. Spain*, 464 U.S. 114, 117-19 (1983) (per curiam). "[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication." *Id*. at 125-26 (concurring opinion).

The judge also was justified in granting anonymity to the jurors in such a high-profile trial involving a gang that though much diminished from its glory days (see Gerry Smith, "25 Years After Notorious Hit, Mob Has Quieter Presence; Chicago's Outfit Weaker Today, Experts Say," *Chicago Tribune*, June 21, 2011, p. C6; John J. Binder, *The Chicago Outfit* 111-12 (2003); Chicago Crime Commission, *Organized Crime in Chicago* 4 (1990)), continues to inspire fear. *United States v. Benabe*, 654 F.3d 753, 761 (7th Cir. 2011); *United States v. DiDomenico*, 78 F.3d 294, 301-02 (7th Cir. 1996) (another prosecution of the Chicago Outfit); *United States v. Moore*, 651 F.3d 30, 48-49 (D.C. Cir. 2011) (per curiam); *United States v. Deitz*, 7 F.3d 672, 684-85 (6th Cir. 2009); *United States v. Gotti*, 459 F.3d 296, 345-46 (2d Cir. 2006). And he was likewise justified in refusing to voir dire the jurors every time the media published news about the trial. The notoriety of the Outfit guaranteed extensive press coverage, resulting in such tidbits as an interview with the government's mob expert, name-calling by a victim's brother, a story that Marcello had been "humiliated" by his mistress's testi-

mony, and an opinion piece saying that the jurors would be "basically stupid" if they didn't convict the defendants. The judge had told the jurors not to pay attention to the media and not to do research on their own. To voir dire them on the subject without reason to believe they were disobeying his order (and no reason to believe that was presented) would have insulted them by implying distrust of their willingness or ability to obey his orders.

But supposing some of them did surreptitiously read the items in question, this would have been very unlikely to influence the verdict. And that is crucial. For there is no duty to voir dire jurors about media coverage that falls short of "prejudicial publicity," *United States v. Trapnell*, 638 F.2d 1016, 1022 (7th Cir. 1980), in the sense of publicity that is likely to affect the verdict. The district judge did not abuse his discretion in determining that the media coverage of this case wasn't prejudicial; it neither was inflammatory nor added anything of substance to the evidence presented at the trial. *United States v. Warner*, 498 F.3d 666, 679 (7th Cir. 2007); *United States v. Sanders*, 962 F.2d 660, 671 (7th Cir. 1992); *United States v. Williams-Davis*, 90 F.3d 490, 499-502 (D.C. Cir. 1996). "It is for the trial judge to decide at the threshold whether news accounts are actually prejudicial; whether the jurors were probably exposed to the publicity; and whether the jurors would be sufficiently influenced by bench instructions alone to disregard the publicity." *United States v. Rasco*, 123 F.3d 222, 230-31 (5th

Cir. 1997), quoting *Gordon v. United States,* 438 F.2d 858, 873 (5th Cir. 1971). And the judge did that.

Nor did he abuse his discretion by allowing the jurors to take a break from jury duty for a week between the rendition of the general verdict and the deliberations on the special verdict, and by declining to sequester them during either set of deliberations. An experienced trial judge who presides over a long jury trial obtains a feel for the jurors' needs, capacities, feelings, and idiosyncrasies that the appellate court can't duplicate, and this means that we're in a poor position to second guess his decisions concerning such matters as scheduling and whether to sequester jurors during deliberations.

Of greater concern are the judge's communications with an alternate juror who, the judge learned from the jury administrator, had said she was uncomfortable serving on the jury. The judge observed her in the jury box and also in a visit to the jury room. He thought she indeed seemed uncomfortable, and maybe anxious and even panicky, so he met with her in private and asked her whether everything was okay. She said it was but also asked whether the trial was nearly over. The judge said it was. She also asked him whether any threats had been made against her, and he assured her that none had been. She said she had not discussed her feelings with any of the other jurors. Nevertheless the judge removed her from the jury. Although she was an alternate, she would have been a deliberating juror had

she not been removed, because other jurors were removed later.

The defendants argue that the judge should have told the lawyers about the situation before removing the juror, and perhaps given them a chance to voir dire her, or at least suggest questions for the judge to ask her. Given her anxieties it would not have been a good idea to confront her with the defendants' lawyers—that is, agents of the defendants; she would have been intimidated by their presence. A defendant's interest in being present at all stages of his trial is limited, *United States v. Bishawi*, 272 F.3d 458, 461-62 (7th Cir. 2001), by the need for orderly administration of criminal trials. The defendants tacitly acknowledge this by not arguing that they should have been present when the judge was discussing the juror's anxieties with her.

But before dismissing her the judge should have told the lawyers about his discussions with her, *United States v. Evans*, 352 F.3d 65, 70 (2d Cir. 2003); *United States v. Edwards*, 188 F.3d 230, 235-37 and n. 2 (4th Cir. 1999); cf. *United States v. Pressley*, 100 F.3d 57, 59-60 (7th Cir. 1996); *United States v. Vega*, 285 F.3d 256, 266-67 (3d Cir. 2002), for they might have suggested that he question her further, albeit outside their presence. She had already answered the essential questions, however, by saying she hadn't been threatened (for remember that she asked the judge *whether* she had been threatened) and hadn't discussed her anxieties with the other jurors. What more was there to ask her?

Given her state of mind, the judge was justified in removing her from the jury. *United States v. Anderson*, 303 F.3d 847, 853 (7th Cir. 2002); *United States v. Edwards*, 342 F.3d 168, 182-83 (2d Cir. 2003); *United States v. Thomas*, 116 F.3d 606, 613-14 (2d Cir. 1997). Had she become a deliberating juror (as she would have), she might have felt pressured to cause the jury to hang in order to avoid mob retribution for returning a guilty verdict. The judge's failure to consult the lawyers was thus a harmless error, as in such cases as *Olszewski v. Spencer*, 466 F.3d 47, 64 (1st Cir. 2006), and *United States v. Evans*, *supra*, 352 F.3d at 70; see also *Remmer v. United States*, 347 U.S. 227, 229 (1954); *United States v. Bishawi*, *supra*, 272 F.3d at 462; *United States v. Edwards*, *supra*, 188 F.3d at 236 n. 2.

Another juror claimed to have discovered, through a combination of overhearing and lip reading, defendant Calabrese mutter when the prosecutor was giving his closing argument "you are a fucking dead man," the "you" apparently being the prosecutor. Nobody else in the courtroom seems to have heard Calabrese's remark. The juror's observation did not come to light until the trial ended, whereupon the defendants moved for a new trial, which the judge denied. The defendants (other than Calabrese, who argues that the juror in question fabricated the story and used the fabrication to poison the other jurors against him) argue that the death threat was made and that it turned the jurors against all the defendants since they were being tried together as coconspirators.

In an evidentiary hearing conducted after the trial, the district judge determined that Calabrese had indeed uttered the remark—the juror hadn't made it up. *United States v. Calabrese*, No. 02 CR 1050, 2008 WL 1722137, at *1 (N.D. Ill. Apr. 10, 2008). But he refused to voir dire the other jurors to determine whether they had heard it and if so whether it had influenced their deliberations. *United States v. Calabrese*, No. 02 CR 1050-2, -3, -4, -10, 2008 WL 4274453, at *5-*8 (N.D. Ill. Sept. 10, 2008). He based his finding that Calabrese had uttered the remark in part on his observations of Calabrese's courtroom demeanor throughout the trial, and that was proper—a judge has the same right as jurors to base credibility findings on demeanor. *United States v. Calabrese, supra*, No. 02 CR 1050, 2008 WL 1722137, at *4-*5; *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008); 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 274, pp. 119-20 (James H. Chadbourn ed. 1979). But he should have inquired whether any of the other jurors had heard or otherwise been made aware of Calabrese's alleged remark, and, if so, whether in conjunction with his other disruptive acts at trial—screaming "them are lies" during the prosecution's argument and making faces and noises—the remark could have seriously reduced the other defendants' chances of being acquitted. See *Remmer v. United States, supra*, 347 U.S. at 229; *United States v. Davis*, 15 F.3d 1393, 1412 (7th Cir. 1994); *United States v. Bristol-Mártir*, 570 F.3d 29, 42 (1st Cir. 2009). The judge may have been too confident that no one had heard the remark except that one juror and too quick to conclude as he did that since the

defendants were a varied lot, the jurors wouldn't hold Calabrese's remark against his codefendants.

But the remark itself in context was not so poisonous that even if all the jurors heard or were told of it their verdict might have been different. By the time of the closing argument the prosecution had provided compelling evidence that all the defendants had knowingly aided the Outfit and at least three had committed serious crimes on its behalf, including participation in a conspiracy to commit murders that had resulted in at least 18 deaths. The incremental shock effect on the jury of Calabrese's threat and his other disruptive conduct could not have made the difference between conviction and acquittal of any of the crimes for which the jury convicted them. *United States v. Mannie*, 509 F.3d 851, 856-57 (7th Cir. 2007); see also *Zafiro v. United States*, 506 U.S. 534, 537-39 (1993); *United States v. Morales*, 655 F.3d 608, 624-25 (7th Cir. 2011).

Anthony Doyle's appellate counsel makes a number of convoluted objections to the jury instructions. Doyle's trial counsel sensibly had not made such objections, which would have confused the jury without increasing the likelihood of acquittal. We discuss just the strongest objection.

Although the judge correctly instructed the jurors that their "verdict, whether it be guilty or not guilty, must be unanimous," Doyle argues that the instructions as a whole allowed the jury to render a non-unanimous guilty verdict, for example because the judge further instructed

the jury that "to prove a defendant guilty of the [RICO] conspiracy . . . the government must prove . . . that the defendant . . . knowingly conspired to conduct or participate in the conduct of the affairs of an enterprise through . . . a pattern of racketeering activity . . . or . . . the collection of unlawful debt." This allowed the jury, Doyle argues, to convict him even if half the jurors thought he had conspired to conduct the affairs of the Outfit only through a pattern of racketeering activity and half only through the collection of unlawful debts, with the jurors failing to agree unanimously on either object of the RICO conspiracy. The jury should, he argues, have been instructed that to return a guilty verdict it had to either find unanimously that the Outfit conspiracy had agreed to engage in a pattern of racketeering activity, or find unanimously that it had agreed to engage in the collection of an unlawful debt, or find unanimously that it had agreed to engage in both a pattern of racketeering activity and the collection of an unlawful debt, and then find unanimously that Doyle had joined the first conspiracy or the second, or both.

This may be correct, cf. *United States v. Griggs*, 569 F.3d 341, 344 (7th Cir. 2009); *United States v. Sababu*, 891 F.2d 1308, 1325-26 (7th Cir. 1989), though we cannot find any cases that address whether pattern of racketeering activity and collection of unlawful debts are separate elements of a RICO violation, which would require unanimity of the jurors on either (or both) to convict (as the jury did), *Richardson v. United States*, 526 U.S. 813, 817-23 (1999), or instead are different ways of committing the

same crime, which would not require unanimity as to each way. *Id*. But suppose the former, that "pattern of racketeering" and "collection of unlawful debt" are indeed separate elements of a RICO offense. Still, not only would the instruction that Doyle's appellate counsel proposes have been difficult for jurors to understand; it would not have changed the verdict, and either or both may have been why Doyle's trial lawyer did not request such an instruction.

The evidence that the Outfit conspiracy contemplated both racketeering activity (such as murder) and the collection of unlawful debts (namely "juice loans," offered at usurious interest rates) was overwhelming. Specific unanimity instructions, as distinct from a general instruction that the jury must unanimously find the defendants guilty beyond a reasonable doubt in order to convict (and that instruction was given), are necessary only when there is a significant risk that the jury would return a guilty verdict even if there were less than unanimity with regard to one or more elements of the crime. There was not a significant risk here, given the weight of the evidence of *both* elements (if they are indeed elements and not means). *United States v. Zizzo*, *supra*, 120 F.3d at 1358; *United States v. Nicolau*, 180 F.3d 565, 572 n. 3 (4th Cir. 1999).

Many of Doyle's other objections are to the absence of instructions that would have required the jurors to agree unanimously on the means by which his conduct satisfied the elements of the RICO offense. But

as we have already intimated, jurors don't have to agree on means. Suppose a defendant on trial for murder had first choked his victim and then shot him, and some jurors think the choking killed him and others that he was alive until he was shot. It is enough that they are unanimous that the defendant killed him. *Richardson v. United States, supra*, 526 U.S. at 817; *Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) (plurality opinion); *id.* at 649-50 (concurring opinion); *United States v. Griggs, supra*, 569 F.3d at 343-44; *United States v. Talbert*, 501 F.3d 449, 451-52 (5th Cir. 2007).

A number of cases say that in a RICO conspiracy case the jury should be instructed that it must agree unanimously on the "types of racketeering activity" that the conspirators agreed to commit. E.g., *United States v. Randall, supra*, 661 F.3d at 1298-99; *United States v. Applins*, 637 F.3d 59, 80-81 (2d Cir. 2011). But we have our doubts (and in any event any error in failing to include such an instruction was harmless). If you joined the Outfit, you agreed to commit or assist in committing an open-ended range of crimes, and it ought to be enough that the jury was unanimous that you indeed agreed that you would commit whatever crimes within that range you were assigned. Another way to put this— a way that preserves continuity with the cases that require that the jury be instructed that it must agree on the "type" of racketeering activity that the conspirators agreed to undertake—is that scope determines type. Suppose conspirators agree to commit any criminal act that will yield a profit of at least $5,000. Cf. *Salinas v.*

*United States*, 522 U.S. 52, 63-64 (1997). Any such act, whether burglary or bank fraud, would then be within the scope of the conspiracy rather than belonging to a separate "type" of racketeering activity, such as burglary or bank fraud.

We need to say something finally about the evidence against Paul Schiro and the restitution order against Doyle. The indictment accused Schiro not only of being a member of the Outfit but also of murdering another member, Emil "Mal" Vaci, because the Outfit was concerned that Vaci might be planning to betray the Outfit to the government. Vaci was murdered, but the jury refused in its special verdict to find that Schiro had been involved in the murder. This was a semantic rather than a substantive finding, because although Schiro wasn't the trigger man, as apparently had been intended, he participated substantially in the planning and surveillance that preceded the murder. Moreover, while his involvement was the most colorful charge against him, the jury was entitled to find, as it did, that he was a member of the Outfit and had conspired with other members to participate in its affairs, knowing that it would commit a variety of crimes, such as Vaci's murder; the jury must have distinguished between conspiracy to do something and involvement in the act.

Schiro's lawyer also complains about the judge's refusal to sever his trial from that of the other defendants, in particular Calabrese, Lombardo, and Doyle, all of whom testified, and whose arrogant and

incredible testimony undoubtedly helped to convict them. Lombardo mentioned his acquaintance with Schiro in his testimony. These defendants would have been well advised not to testify, and their decision to testify hurt Schiro. But no reasonable jury would have acquitted Schiro even if he had been tried by himself (or with Marcello, who also didn't testify), so ample was the evidence of his membership in the Outfit conspiracy.

The defendants were ordered to pay restitution in conformity with the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A. The total amount, all of which was for the lost future earnings of 14 of the 18 murder victims whom the defendants were found to have conspired to kill, exceeded $4 million. All but 1 percent of this amount, $44,225.73, was allocated jointly and severally to the four defendants, see *United States v. Dokich*, 614 F.3d 314, 318 (7th Cir. 2010), other than Doyle, who was assessed only the 1 percent because he had joined the conspiracy late, in 1999. As all the murders occurred before then, it was improper to assess him any share of the restitution ordered. *United States v. Squirrel*, 588 F.3d 207, 215-16 (4th Cir. 2009). That is the only reversible error we find, and so other than reversing that part of his sentence we affirm the judgments.

AFFIRMED IN PART AND
REVERSED IN PART.

WOOD, *Circuit Judge,* dissenting in part. If anyone doubted that the Chicago Outfit during its heyday ranked as one of the most dangerous and reprehensible criminal organizations in our nation's history, the record compiled in this case would put those uncertainties to rest. And the five defendants now before us—Frank J. Calabrese, Sr., James Marcello, Joseph Lombardo, Paul Schiro, and Anthony Doyle—sat at the very top of the enterprise. The indictment on which this quintet stood trial is breathtaking in its temporal and substantive scope: through the convenient device of the conspiracy offense, the government has been seeking to hold the defendants responsible for virtually everything that the Outfit did or sponsored for a 42-year period (1960-2002). Although I have a few reservations that I explain below about the convictions of Lombardo, Schiro, and Doyle, in the end I join my colleagues in affirming their convictions and sentences. Regrettably, however, I must part company with their assessment of the double jeopardy argument that Calabrese and Marcello have advanced. In their view, *ante* at 9, that argument is "even weaker" in light of the evidence presented at the second trial than it was when this panel rejected this argument before the 2005 trial began. See *United States v. Calabrese,* 490 F.3d 575 (7th Cir. 2007). I draw the opposite conclusion: the double jeopardy violation that I feared would occur from this retrial has unequivocally occurred. Calabrese and Marcello had each already been convicted and imprisoned for their part in the street crews that lie at the heart of the Outfit's Chicago opera-

tion. See *United States v. Zizzo,* 120 F.3d 1338 (7th Cir. 1997) (Marcello), and *ante* at 3. Those prosecutions covered the period from 1978 to 1992 for Calabrese and from 1979 to 1990 for Marcello. The current prosecution entirely subsumes the span of those conspiracies. I therefore dissent, on that basis only, from the decision to affirm those two convictions.

## I

At first glance, the Fifth Amendment's prohibition that no person can be "twice put in jeopardy of life or limb" for "the same offense," U.S. CONST. AMEND. V, is clear enough. As we have explained, "the double jeopardy clause imposes limits on a defendant's criminal exposure. . . . [T]he government cannot reprosecute a defendant for the same offense whenever it obtains broader evidence of criminal culpability." *United States v. Thornton*, 972 F.2d 764, 765 (7th Cir. 1992). But this simple rule becomes difficult when the "same offense" in question is a conspiracy; the problems compound when it is a RICO conspiracy. A conspiracy has "no easily discernable boundaries with regard to time, place, persons, and objectives." *Id.* How, then, can we tell when one conspiracy ends and another picks up? The question becomes even more vexing when we deal with members of a complex enterprise who have allegedly conspired to violate RICO. A RICO "enterprise" is loosely defined as "a group of persons associated together for a common purpose of engaging in a course

of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

This case requires us to decide under what circumstances it is permissible to carve multiple "enterprises" out of one group. And we must do so with reference to the tightly organized, hierarchical organization commonly known as the Chicago Outfit. As the prosecution has conceded, the Chicago Outfit was organized as follows between 1960 and 2005:



Each Street Crew was headed by its own Boss, called a "Capo" (literally meaning "head," from the Latin word "capus"—familiar to English speakers from the word "decapitate," meaning to cut off the head). As I will describe in more detail in a moment, it is true that the earlier prosecutions of Calabrese and Marcello focused primarily on their work at the Street Crew level than on the relation between the Crews and the Boss, while the current cases look at the big picture. But that does not

change the fact that both cases are inescapably about the entirety of the operation. Tempting though it may be to slice these activities more finely when we evaluate the earlier cases (pretending that the Street Crews were somehow independent of the higher echelons of the organization) and to focus on the vertical relation between the Boss and the Crews (pretending that the organization as a whole had some existence apart from its Street Crews), the facts compel the conclusion that those inside and outside the group understood throughout every relevant time that this was all one integrated, highly coordinated organization.

The majority has drawn an analogy to complex legitimate corporate enterprises (which obviously should be no worse off under either RICO or the Double Jeopardy Clause than their illicit counterparts), but this exercise does not strengthen its point. Suppose we think of the Outfit as a company and the Street Crews as its branch offices, rather like the Ford Motor Company and its River Rouge Complex. The majority concedes that a worker at the Ford River Rouge Complex is affiliated not only with that immediate Complex, but is in fact an employee of the overarching enterprise known as Ford Motor Company. *Ante* at 5. By working on the assembly line there, he contributes to Ford's business. *Id.* And if Ford made two different products—say cars and bicycles (or sawed-off shotguns, as the majority postulates)—the worker on the car line would still be working for Ford, just as the worker in the bicycle plant (or the shotgun business) would be. The key point is

that there is only one enterprise, which makes money through multiple lines of commerce.

The majority notes that certain actions can be taken by the line workers (the Crew members) only with the approval of central management (the Boss). In the Outfit's case, this includes committing murder; in the Ford example, we can imagine a host of more mundane activities such as deciding to build a new line of cars, making a hiring decision, or authorizing an expenditure over $1,000. Such limitations on the authority of lower management and line workers are routine in the business world; no one subject to them would think for a moment that the actions he was authorized to take on his own (such as expenditures below the threshold) were *not* for the enterprise's welfare, while actions he took with approval of higher management were. The Ford employee is still a Ford employee, whether he exercises delegated discretion or whether he must follow the orders of his Ford superiors. Should the janitorial staff at the River Rouge Complex be considered to be conspiring with a different "enterprise" than a notional enterprise made up of the assembly line workers? What if the sanitation workers required approval from HR before they hired a new janitor to join their ranks? Would the action of hiring a janitor somehow become associated with the "HR-enterprise," but all other janitorial actions remain confined to the "janitor-enterprise"? Nothing in either the Double Jeopardy Clause or RICO calls for such inconsequential distinctions. Indeed, if the majority's view were correct, we

would eviscerate any protection the Double Jeopardy Clause provides against repeat prosecutions for conspiracy; single organizations could be carved into any number of different "enterprises" to avoid the Clause's protection. (I note in passing that the Supreme Court has treated corporations as "persons" for purposes of the Double Jeopardy Clause. See, *e.g., United States v. Martin Linen Supply Co.,* 430 U.S. 564 (1977).)

To make the analogy clearer, let's pretend that a hypothetical car manufacturer, Voiture, is using some of its employees to run a video poker side-business at a local bar, and that the employees are well aware that these activities violate the law. Let's further assume that a Voiture employee works full-time at its assembly line in Indiana, spending most of her days at that facility making cars but occasionally conferring about the poker business with her superiors at headquarters over the phone or in person. Law enforcement agents get wind of illegal conduct taking place and bring an indictment against the Indiana employee. The indictment charges that the Indiana facility is a RICO enterprise, and that the employee has conspired with members of that enterprise to further the activities of the video poker business at the bar in question, using company facilities and time. After a trial, a jury finds her guilty and she serves time in prison.

Years pass, and another Voiture employee decides that he has had enough with the corporation and its illegal activities. He decides to turn on his coworkers and tell law enforcement everything he knows. (Or perhaps,

closer to this case, confronted with his own misdeeds
he comes clean in exchange for the government's le-
niency.) Through this informant, officials have proof for
the first time that the employee who was prosecuted
earlier actually was handling video poker for Voiture in
all of central Indiana, not just in the bar that was
involved in the first case. They decide to charge her
again, this time with an indictment covering the full
scope of her crimes. Again, rather than charge her for
the underlying substantive conduct, they charge her
with *conspiracy*. This time, prosecutors are careful to
say that the enterprise is Voiture as a whole, not just
the Indiana regional center. Moreover, they emphasize
that Voiture's central management had to approve
each location for the illegal machines. This, they say,
avoids any double jeopardy problem, because (the argu-
ment goes), the enterprise whose illegal activities she
was furthering the second time was Voiture, not its
Indiana plant.

Such a distinction would be absurd. Higher manage-
ment was already fully implicated in the earlier
scheme. Nothing separates the "enterprise" of the plant
from the "enterprise" of the company as a whole. Compa-
nies work through people; large companies usually
find it convenient to work through divisions based on
geography, line of business, or both. The Indiana em-
ployee, by working for the Indiana assembly plant and
consulting as need be with higher management, was by
definition working for the company as a whole. The fact
that Voiture organizes itself in a vertical structure

with regional manufacturing centers does not mean
that each center is a separate enterprise from Voiture
itself, even if the centers cannot take certain actions
without the approval of Voiture's management. This
reality cannot be evaded by naming the regional center
of Voiture in the charging documents the first time
around. Nor, in this case, can it be evaded by naming
the Street Crews first and later appealing to an Outfit-
wide conspiracy.

Returning to our case, no one disputes the fact that
the Calabrese and Marcello Street Crews operated within
and exclusively for the Outfit. This can only mean that
their prosecutions were for the work that they did for
the Outfit, each one through his own Street Crew.
The facts developed at trial simply do not support the
proposition that the Crews were stand-alone operations,
acting as independent contractors for the Outfit. Nor is
this a case in which either Calabrese or Marcello is
being asked to be criminally responsible for the activities
of other Street Crews, *qua* Street Crews. The only differ-
ence between the present case and each man's earlier
prosecution—a difference to which the government
alludes repeatedly—is the wider scope of the recent
prosecution, and especially the fact that it encompasses
murders authorized at the highest levels of the Outfit.
Disturbing though this conduct is, however, these
murders do not support the proposition that the enter-
prise known as the Outfit is different from the enterprises
involved in the first cases. We must recognize, as have
our sister circuits, that a crime family in "a lower level of

authority within the hierarchy of organized crime" is still a component of the same crime family. *United States v. Langella*, 804 F.2d 185, 189 (2d Cir. 1986); see also *United States v. Ciancaglini*, 858 F.2d 923 (3d Cir. 1988) (concluding that two Philadelphia-based crime families were part of the same enterprise). If the Street Crews were "self-sufficient enterprises that function[] without oversight" from the Outfit, we would have a different case. *Langella*, 804 F.2d at 189. But as the majority concedes, they are not. The Street Crews were the mob's hands, the Outfit its head. There is no way to divide the two.

## II

My dissent does not proceed from the assumption that one person is incapable of entering into two different RICO conspiracies with the same enterprise. I agree with the majority that the contrary is true. As the Second Circuit noted in *United States v. Basciano*, "enterprise and pattern are distinct elements of racketeering." 599 F.3d 184, 204 (2d Cir. 2010). I therefore have no quarrel with the proposition that a person who has once been prosecuted for a low-level conspiracy (perhaps to sell marijuana from a corrupt branch office of a company), is not immune from prosecution in a different, much larger conspiracy (such as a nationwide conspiracy orchestrated at the highest levels to commit financial fraud). In that example, even though the wrongdoer would have made a second agree-

ment with the same enterprise, it would have been an agreement to commit a different *pattern* of racketeering activity.

As I read the majority's opinion, it accepts that if the Carlisi and 26th Street Crews were doing the actual work of the Outfit during the times covered by their earlier indictments, then this would be a different case. But, they conclude, neither Crew was doing so. My problem with that conclusion is not with the theory but with the application. As I said before, it is certainly possible that a case could arise in which actions taken by the Outfit amounted to a different pattern of racketeering than the activities that take place at the Crew level, even though the two are part of the same enterprise. But the facts of this case show instead a single co-ordinated operation. We can see this by considering the various types of evidence that shed light on the question whether two conspiracies conducted by the same enterprise are distinct. This includes "(1) the time of the various activities charged as separate patterns of racketeering; (2) the identity of the persons involved in the activities under each charge; (3) the statutory offenses charged as racketeering activities in each charge; (4) the nature and scope of the activity the government seeks to punish under each charge; and (5) the places where the corrupt activity took place." *United States v. Marren*, 890 F.2d 924 (7th Cir. 1989); see also *United States v. Sertich*, 95 F.3d 520 (7th Cir. 1996). When the answers to each of these questions point in the same direction, the court must find that there is just

one pattern of racketeering and the conspiracies had essentially the same object. In such a case, it would violate double jeopardy to bring a second prosecution.

It may help in this case to compare the first and second prosecutions using a table, beginning with Calabrese's case. It is undisputed that the time and location of his earlier indictment are completely subsumed within the present one. I thus focus on the parts of the indictment summarizing the offenses charged:

| Calabrese | 1995 Indictment | 2005 Indictment |
| --- | --- | --- |
| **Enterprise** | "The Calabrese Street Crew was part of a larger criminal organization known to the public as 'the Mob,' and to its members and associates as 'The Outfit.'" | "The Chicago Outfit was known to its members and associates as 'the Outfit' and was also known to the public as 'organized crime,' the 'Chicago Syndicate' and the 'Chicago Mob.'" |
| **Purpose** | "The Calabrese Street Crew existed: (1) to generate income for its members through illegal activities, and (2) to cover up and to conceal evidence of the crew's involvement in illegal activities after commission of those illegal acts." | "The Chicago Outfit existed to generate income for its members and associates through illegal activities." |

| | | |
|---|---|---|
| **Activities** | "The illegal activities of the crew included, but were not limited to: (1) making loans to individuals at usurious rates of interest [juice loans] . . . (2) 'collecting' through 'extortionate means' juice loans constituting 'extensions of credit,' . . . (3) collecting debts incurred in the crew's juice loan business, . . . (4) using threats, violence and intimidation to collect juice loan debts and to discipline crew members; (5) devising a scheme to defraud and to obtain money and property by means of false and fraudulent representations through the use of the mails; and (6) tampering with witnesses to, and victims of, the crew's illegal activities." | "The illegal activities of the Chicago Outfit included, but were not limited to: (1) collecting 'street tax,' that is, extortion payments required as the cost of operating various businesses; (2) the operation of illegal gambling businesses, which included sports bookmaking and the use of video gambling machines; (3) making loans to individuals at usurious rates of interest [juice loans]; (4) 'collecting' through 'extortionate means' juice loans constituting 'extensions of credit' . . . (5) collecting debts incurred in the Chicago Outfit's illegal gambling business . . . (6) collecting debts incurred in the Chicago Outfit's juice loan business . . . (7) using threats, violence, and intimidation to collect street tax and juice loan debts; (8) using threats, violence, and intimidation to discipline Chicago Outfit members and associates; (9) using murder of Chicago Outfit members, associates and others to advance the interests of the Chicago Outfit's illegal activities; (10) obstructing justice and criminal investigations by . . . murdering witnesses . . . and (11) traveling in interstate commerce to further the goals of the criminal enterprise." |

These quotations from the two indictments demon-
strate that the only difference between the earlier and
the later one is that the second contains a wider array of
alleged criminal activity. But federal courts use a "same
offense" test for double jeopardy purposes, not a "same
evidence" or even a "same allegation" test. *United States
v. Dixon*, 509 U.S. 688, 696 (1993). Thus, if the *pattern*
of activity is the same, even if there are some difference
in detail, this points to a finding of "same offense."

Here, the second indictment adds to the first's list of
the Outfit's illegal activities and in some respects is more
specific. It offers more detail about the street tax and
illegal gambling operations, and it squarely accuses the
defendants of committing murder in furtherance of
their illegal conspiracy. Obviously, murder is as serious
a charge as can be made, but the addition of murder to
the list does not change the nature of the offense with
which these defendants were charged: RICO conspiracy.
Although the government and majority focus on murder
as the key distinguishing feature, they overlook the
fact that the earlier indictment accused Calabrese of
being responsible for highly violent activity against
both Outfit members and witnesses. When the federal
government later uncovers additional evidence of
discrete acts of such violence, it is free to prosecute
Calabrese for those acts (assuming that a federal statute
covers them) or assist state authorities in a state pros-
ecution, but it cannot reprosecute him for the *agreement*
he made with the Outfit to engage in that pattern of
conduct just because it finds evidence of ever more

heinous actions in support of that agreement. It is worth noting that if the earlier charge had been a substantive one accusing Calabrese of extortion, and the new indictment charged him with the substantive offense of murder, the situation would be entirely different: those are two different offenses. Indeed, the government might this time around have been able to prosecute one or both of these defendants for conspiracy to commit murder for the purpose of gaining entrance to or maintaining a position in an enterprise engaged in racketeering, in violation of 18 U.S.C. § 1959(a). See *Basciano*, 599 F.3d at 198-99 (holding that a conspiracy to violate Section 1959 is not the same offense as a conspiracy to violate Section 1962). But that is not the choice that it made.

The overlap in Marcello's two indictments is even greater. Calabrese's second indictment differed slightly from the first because it contained more detailed references to illegal gambling, street tax, and the additional allegations of specific murders. Marcello's first indictment is even closer to the second because the first referred to illegal gambling and attempted murder. And because Marcello went to trial in both the earlier and present cases, the evidence presented at his trials brings the double jeopardy violation into even sharper view. Crucially, given the majority's current emphasis on the murder evidence, the government *also* presented evidence about the commission of six murders at Marcello's first trial. Finally, in both of Marcello's trials the government elicited testimony that implicated

the *same* nineteen people (in addition to the five standing trial) in the Outfit's conspiracy. The current trial had an unmistakable air of *déja vu*.

The majority may well be correct that its hypothetical Ford worker who agrees to manufacture guns at time A could also be convicted of a separate conspiracy if, at time B, he agrees to work at corporate headquarters to conceal the illegal income from guns. *Ante* at 6. To determine whether those two prosecutions would be barred by the Double Jeopardy Clause we would look to the same five-factor test outlined above; if the activities were indeed sequential and did not overlap and the activities were distinct as they seem to be (building guns versus concealing income), there may be no problem with prosecuting the income-concealment conspiracy after gun-manufacturing conspiracy. Unfortunately, that example does not describe this case. Here, the government's charges against Marcello and Calabrese covered the same period of time and the same pattern of racketeering activity. The Outfit's commission of violence and murder was a greater focus of the government's case the second time around, but it was also a component of the first two prosecutions.

Perhaps the government played its cards too soon by moving ahead with the earlier prosecutions (how could it have known that in 1999 the FBI would rediscover gloves that Nick Calabrese carelessly discarded after the 1986 Fecarotta murder, that the gloves would still have Nick's DNA on them, and that

this would lead him to flip), but that is the price that occasionally is exacted by the Double Jeopardy Clause. Conspiracy can reach back almost indefinitely. If the conspiracy itself is a durable one that lasts over many years or even decades, as this one did, the indictment could (as this one did) reach back even to the year in which the distinguished U.S. Attorney for the Northern District of Illinois was born. When the government chooses to use this broad and powerful tool once, however, "its choice has consequences." *Basciano*, 599 F.3d at 203. One of those consequences is refraining from prosecuting the defendant again, for the *same* conspiracy, when it obtains broader evidence of criminal culpability. As I explained in my separate opinion before these trials went forward, I see no difference in the essential agreement that was at issue in the earlier cases and in this case. I would reverse Calabrese and Marcello's convictions on the ground that the present trial has violated their rights under the Double Jeopardy Clause. To this extent, I therefore respectfully dissent.

### III

Although I agree with the outcome the majority reaches on the remaining issues, I find two of those questions to be closer than they do, and so I add a few words about them.

*A. Voir Dire*

All of the defendants except Doyle argue that the district court should have asked the jurors whether they had been exposed to various news articles that were published during the trial. I agree with my colleagues that the district court's decision not to do so does not amount to reversible error. Even if a district court's failure to *voir dire* is error, we reverse only if "there is any substantial likelihood that the defendants were denied a fair trial." *United States v. Balistrieri*, 779 F.2d 1191, 1214 (7th Cir. 1985). Here, even if the jurors had read all of the items the defendants have complained about, it would not have made any difference to them. Things might be different if the news articles had contained references to inadmissible evidence or information going beyond the horrific account to which the jurors were exposed during the trial, but I am satisfied that those problems did not arise.

My concern is over the district court's wholesale refusal to explore the jurors' exposure to outside publicity. My colleagues find no problem with that and so do not need to reach the issue of harmless error; I am not so sure. When a defendant's notoriety "guarantee[s] extensive press coverage," *ante* at 14, it is imperative that the court be ready to make use of the limited two-step *voir dire* process we established in *Margoles v. United States*, 407 F.2d 727, 735 (7th Cir. 1969), to ensure that the trial is fair. *Voir dire* helps to guarantee that a trial's outcome is determined by events

inside the courtroom, not what is going on outside in the court of public opinion. Since *Margoles*, we have repeatedly told district courts that when "prejudicial publicity is brought to the court's attention during a trial . . . the court *must* ascertain if any jurors who had been exposed to such publicity had read or heard [it]." *United States v. Trapnell*, 638 F.2d 1016, 1022 (7th Cir. 1980) (emphasis added). This is not meant to be a burdensome procedure; only when a juror admits that she has read or heard the item in question must the court go on to examine that juror about the publicity's effect. *Id.* Far from insulting the jurors, asking a simple question about whether they have read or heard an item reiterates the importance of the court's instruction to avoid the news, and thus communicates to the jury the court's respect for the fair trial rights of the accused. For a court to refuse to conduct *voir dire* even *once* in the course of a sensitive and lengthy trial with extensive media coverage, especially after defendants brought to light some articles that were borderline prejudicial (such as the op-ed telling jurors they were "stupid" if they did not convict), was a move that could have undermined the whole trial. A court should not risk jeopardizing the outcome of the trial by failing even to check that jurors were following the instructions. The fact that the gamble worked here, and that the record does not support a finding of prejudicial error, is not enough to commend this practice.

### B.  Marcello's Voice Identification Expert

Finally, I do not believe the district court's decision to exclude expert testimony on the reliability of voice identification evidence was correct, although I agree with my colleagues that it does not require reversal.

Marcello was accused of murdering Michael Spilotro. Spilotro's daughter, Michelle, testified that on the day of her father's murder, a man called their home and asked to speak to him. She testified that the same person had regularly called her father. Three years after Spilotro's death, Michelle listened to a "voice lineup" put together by the FBI. The first five voices on the tape were those of officers reading a sample piece of text; the last was Marcello's. Michelle picked Marcello's voice as the one she remembered hearing on the day of her father's death. At trial, she told the jury that she was "100 percent sure" it was Marcello's voice she had heard on the phone.

Marcello sought to have an expert, Dr. Daniel Yarmey, testify about the reliability of voice identification. Dr. Yarmey is a professor of psychology who has conducted extensive research in the areas of memory; he has investigated voice identification in particular. His testimony would have done much more than tell jurors "voice identifications frequently are mistaken." *Ante* at 13. He was prepared to educate the jury about error rates associated with voice identification— in some studies, misidentification rates were as high as 45%—and the factors that affect the reliability of

voice lineups. Dr. Yarmey had also conducted his own evaluation of the lineup that Michelle Spilotro had heard. He recruited 157 undergraduates at his university to listen to the lineup, evaluate it using a number of factors, and try to identify the suspect's voice. The listeners were able to do so at a rate that exceeded pure chance.

The district court refused to admit this expert testimony, not because of any deficiencies in Dr. Yarmey's qualifications, but because the district court believed that this information was something the "jury knows anyway." The court also assessed the voice lineup on its own and concluded that there was "nothing about the difference [between Marcello's voice and the others] that would suggest to a hearer, to a listener, that one or the other was actually the suspect."

Even though our review of a district court's decision not to admit expert testimony is deferential, see *United States v. Carter*, 410 F.3d 942, 950 (7th Cir. 2005), in my view the district court's refusal to admit Dr. Yarmey's testimony was a mistake. In recent years, courts have become more aware of the reality that human memory is not necessarily reliable. A study of 200 wrongful convictions revealed that 79% rested in part on mistaken eyewitness identifications. Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55, 60 (2008). This does not mean that courts must impose a blanket ban on such testimony, but it is critical to be cautious. We cannot ignore the power that a witness's claim to be "100% sure"

may have on a jury, nor can we ignore that such witnesses are sometimes, unfortunately, mistaken. The Supreme Court recently emphasized that one tool that courts can use to ensure juries do not give such testimony more weight than it is worth is to allow "expert testimony on the hazards of eyewitness identification." *Perry v. New Hampshire*, 132 S. Ct. 716, 729 (2012). As Dr. Yarmey's resarch shows, a witness's voice memory is not exempt from the sort of problems that we more commonly associate with a witness's vision; just as with eyewitness identification, expert testimony on the reliability of voice identification reveals vulnerabilities that lie outside the range of common knowledge.

The district court's decision not to admit Dr. Yarmey's testimony evinces a misunderstanding of the purpose of expert testimony on the reliability of a witness's memory. As we explained in *United States v. Bartlett*, expert testimony should not be kept out simply because a court believes "jurors know from their daily lives that memory is fallible." 567 F.3d 901, 906 (7th Cir. 2009). That may be true, but "[t]he question that social science can address is *how* fallible," *id.,* and thus how deeply the jury might wish to discount any given identification. "That jurors have beliefs about this does not make expert evidence irrelevant; to the contrary, it may make such evidence vital, for if jurors' beliefs are mistaken then they may reach incorrect conclusions. Expert evidence can help jurors evaluate whether their beliefs about the reliability of eyewitness testimony are *correct*." *Id.* As is clear from the district court's

remarks in this case, the court itself held beliefs about the reliability and suggestiveness of the voice lineup that are belied by the expert's conclusions. As far as we know, the jurors shared these misconceptions. This case thus highlights why it is critical for jurors to hear expert testimony in order to be able correctly to evaluate a witness's memory. Just because courts have routinely admitted laywitness identification in the past is no reason to continue to do so without skepticism, in light of modern research showing the fallibility of such identifications. When a court does admit such identification testimony, expert testimony will often be necessary to enable jurors to properly evaluate its reliability.

I do not believe, however, that this error warrants reversal of Marcello's conviction. Even if Michelle Spilotro had not testified, there was ample additional evidence—notably Nick Calabrese's testimony—that implicated Marcello in Spilotro's murder. The error was therefore harmless.

*     *     *

In conclusion, I would affirm (with the minor adjustment for Doyle's restitution obligation discussed in the majority's opinion) the convictions and sentences of Joseph Lombardo, Paul Schiro, and Anthony Doyle. I would reverse the convictions of Frank J. Calabrese, Sr.,

and James Marcello, on the ground that this prosecution violated each man's rights under the Double Jeopardy Clause. To that extent, I respectfully dissent.