In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1353

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARK MANNIE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 705—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED SEPTEMBER 12, 2007—DECIDED DECEMBER 12, 2007

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* This case involves an exceptional set of circumstances that compels this Court to grapple with the concept of a fair trial. The defendant, Mark Mannie, appeals his conviction after a trial by jury. The jury found Mannie guilty of conspiracy to knowingly and intentionally possess marijuana with intent to distribute, knowingly and intentionally distributing marijuana, and knowingly possessing a machine gun. He argues that the district court abused its discretion by denying his motions for mistrial and severance given his co-defendant's severe and violent disruptions during the trial and the fact that some jurors felt threatened by

members of the gallery. For the reasons stated herein, we vacate the conviction and remand for a new trial.

## I.  Background

### A.  Pre-arrest Factual History

Mark Mannie worked as a paper deliveryman by day and at a Wendy's restaurant by night. The government alleges that he was also a low-ranking member of the Black P Stones street gang. His co-defendant and long-time friend, Aaron Patterson, was convicted of double murder and sentenced to death in 1989, only to be pardoned by Governor George Ryan in 2003 after it was revealed that his convictions rested on perjured testimony coerced by the government. Upon his release, Patterson emerged as a vocal community activist,[1] though the government maintains that he also operated as a high-ranking member of the Black P Stones gang. Another individual, Mario Maldonado, was a member of the Latin Kings gang and a known drug dealer with a criminal record. After being arrested for possession with intent to distribute marijuana and rock cocaine, Maldonado agreed to cooperate with the authorities in their investigation of Patterson in exchange for having his charges dropped.

Mannie played what was essentially a bit role in a series of transactions between Patterson and Maldonado involving the sale of marijuana, heroin, and firearms. Specifically, Patterson sold or arranged for the sale of heroin and/or marijuana to Maldonado on nine occasions between April 3, 2004 and August 5, 2004. Each deal was recorded, videotaped, and/or viewed by law enforcement

---

[1]  He worked on issues involving police brutality and prosecutorial misconduct, coordinated voter registration efforts, and advocated for greater job opportunities for African-Americans.

officials. At nearly each of the first several meetings, Patterson indicated his desire to buy guns from Maldonado. That exchange ultimately took place on August 5, 2004. Early that day, Patterson and Maldonado discussed bringing a second driver so that they would not have guns on them as they drove in Patterson's car to get drugs as a part of their exchange. Patterson called Mannie and asked him to meet him at a CITGO gas station. Mannie claims that Patterson asked him to pick up some "replicas." Regardless, Mannie met Patterson and Maldonado at the gas station. The deal was for him to exchange, on behalf of Patterson, marijuana for the guns. It is unclear whether Mannie had the marijuana before he arrived at the gas station or whether one of Patterson's associates gave it to him at the gas station. In any case, the drugs were wrapped up, and Mannie asserts that he did not know that the package contained marijuana. Mannie then drove and followed Maldonado to his apartment, where they then exchanged the marijuana for the guns. Mannie maintains that he thought that the guns were only replicas, though video surveillance at Maldonado's apartment indicates that Mannie knew that the guns were not fake. As Mannie left Maldonado's apartment, he was arrested.

## B. Proceedings Below

On August 11, 2004, Mannie was indicted and charged with conspiracy to knowingly and intentionally possess marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1); knowingly and intentionally distributing marijuana in violation of 21 U.S.C. § 841(a)(1); and knowingly possessing a machine gun as defined in violation of 18 U.S.C. § 922(o)(1) and (2). He and Patterson were tried as co-defendants. The trial started on July 12, 2005 and ended on July 28, 2005. Mannie moved for a

mistrial or severance on July 25 and July 27 based on Patterson's conduct during the trial. The district court denied both motions. On July 29, 2005, the jury found Mannie guilty on all three counts. Mannie filed a timely motion for a new trial, and on December 16, 2005, the court denied the motion and sentenced him to 60 months' imprisonment and three years of supervised release.

### C. Disruptive Conduct During Proceedings

With Mannie initially sitting idly at the sidelines, Patterson stole the show at their joint proceedings. It was clear from the beginning that Patterson believed that he was again being set up by the government, and that he had no intention of peacefully cooperating during the trial. Specifically, Patterson engaged in the following disruptive conduct during pretrial proceedings:

– On August 6, 2004, after both defendants were arrested, they appeared in court, and Patterson disrupted the court several times (even receiving applause from the audience). He admonished the court to "get used to this."

– On May 25, 2005, the court held a pretrial conference, and Patterson repeatedly spoke out of turn and yelled, threatening the trial judge that "you're going to have to run me out of this courtroom [sic] if you're not going to listen to me."

– On May 26, 2005, during pretrial motions, Patterson again disrupted the proceedings, and he was subsequently removed from the courtroom.

– On May 27, 2005, the court held a pretrial conference regarding Patterson's competency to stand trial. An expert psychologist testified that Patterson characterizes himself as a revolutionary, that

he takes a very active and personal role in his
defense, and that he goes to extremes to get his
point across. Patterson was present and repeatedly
interrupted the proceedings.

In addition, Patterson engaged in the following disrup-
tive conduct during jury selection:

– On June 30, 2005, Patterson (who was wearing
an orange jumpsuit during the proceedings) argued
with the court and threatened his own lawyers.
His lawyer warned that Patterson "will go off," and
asked to be withdrawn because "we are now on an
escalating scale and I do not wish to be a part
of this circus." The court eventually ordered
Patterson removed from the courtroom because he
was using it as a forum to invite members of the
audience to engage in civil disobedience. The entire
panel of jurors from that day was dismissed. When
Patterson returned for the afternoon session he
was disruptive again, and the court excused him
from the session.[2]

– On July 1, as prospective jurors were being inter-
viewed, Patterson's counsel asked for a sidebar
and told the court that he was interfering with
counsel. The court excused the jurors and
Patterson, enraged, started to shout and swear.
The court then had Patterson removed from the
courtroom, and dismissed the jurors and started
over with a third panel.

Patterson then refused to attend the trial. The court
asked Patterson to return on nearly every day of the trial.
The court had conditioned Patterson's return on a repre-
sentation that he would behave, and he made it clear that

---

[2] The district court did note at this point that Patterson's
conduct could jeopardize Mannie's right to a fair trial.

he had no intention of doing so. In fact, he explicitly related to the court that if he returned, he would deliberately disrupt the proceedings. Nevertheless, he did finally return to the trial on July 21st wearing his prison garb.

Given the tension that had mounted during pretrial proceedings, it is not altogether surprising that the following events unfolded during the joint trial:

- On July 15, one juror identified "unsavory" individuals in the gallery who were staring down members of the jury.

    - The court conducted a *voir dire* of this juror who expressed that this would not affect his impartiality, and that he was mostly speculating and did not truly think that he or any juror perceived there to be a serious problem.

- On July 20, at least one juror witnessed what some of them believed to be gang members making gang signs with Mannie. Some jurors noticed members of the gallery staring at them in order to memorize their faces.

    - The court conducted a *voir dire* of the jury. One juror noticed the gang signs between Mannie and a spectator, and expressed that she did not "want people coming to [her] home in the middle of the night to kill [her]." She also declared that "many of us don't want to be here . . . [w]e don't want to be involved for safety reasons." This juror was dismissed. The rest of the jury gave equivocating responses with respect to how they felt about the gallery, but nevertheless maintained that they could remain impartial.

- On July 21, Patterson gestured at the jury. In addition, a juror (and a court security officer) noticed a member of the gallery staring at the jury.

– This individual was eventually barred from the building, and the court reminded the jurors that if they had any concerns at any time, they should raise it with the court.

– On July 25, the courtroom drama escalated to a new level. While Mannie's counsel was cross-examining a government witness, Patterson interrupted and yelled at counsel to "get off [his] case" and accused the defense attorneys of setting him up for a fall. He then stood up, knocked one of his attorneys to the ground, grabbed the other attorney by his necktie, and threw him to the ground as well. Both attorneys were in a tangle in the corner and one limped around afterwards.

– At this point Mannie moved for a mistrial or severance. The court then conducted a *voir dire* of each juror individually. One juror acknowledged that she was "human" but "hoped" that she could be fair. This juror was dismissed. The rest of the jury expressed an awareness of the extreme nature of these actions, but indicated that they could still remain impartial. The court then denied Mannie's motion for a mistrial and severance.

– The next day the government motioned to bar Patterson from returning from the courtroom for his own testimony and instead testify via video feed (which the court had already set up). The district court eventually denied this motion.

– On July 26, the gallery became vocal during Mannie's testimony.

– On July 27, Patterson refused to answer questions during cross-examination and instead invoked

conspiracy theories and referred to the proceedings as a legal lynching.

—   Mannie moved for a mistrial. The court denied the motion almost immediately without polling the jury. Instead, it instructed the jury to disregard Patterson's conduct and testimony.

Before deliberations, the district court instructed the jury to give separate consideration to both defendants, disregard any noise or outburst, and give no weight to Patterson's absence during the trial. After the verdict, Mannie moved for a new trial arguing that the court erred in denying his motions for severance or mistrial. The court rejected his motion and issued a written opinion, concluding that Mannie sought a severance well after the trial had begun, and that the court's use of *voir dire* and cautionary instructions were sufficient to eliminate bias.

## II. Discussion

This Court reviews the district court's refusal to grant a mistrial for abuse of discretion. *United States v. Canino*, 949 F.2d 928, 937 (7th Cir. 1991) (citations omitted). A district court abuses its discretion when it commits an error of law or makes a clearly erroneous finding of fact. *Shakman v. City of Chicago*, 426 F.3d 925, 932 (7th Cir. 2005). Consistent with this standard, it is presumed that the trial judge is in the best position to determine whether a cautionary instruction, rather than a mistrial, is sufficient to address any potential prejudice. *Canino*, 949 F.2d at 937; *see also United States v. Tejeda*, 481 F.3d 44, 53-54 (1st Cir. 2007) (stating that the district judge is in the best position to assess the candor and credibility of the jurors during the *voir dire* following a motion for mistrial). Nevertheless, when reviewing the denial of a mistrial in this context, this Court must ultimately determine

whether the defendant was deprived of a fair trial. *United States v. Clarke*, 227 F.3d 874, 881 (7th Cir. 2000).

The government contends that the district court did not err in denying Mannie's motion for a mistrial because the trial judge: 1) conducted a *voir dire* of each individual juror; 2) dismissed the only two jurors who expressed reservations about being fair; and 3) issued cautionary instructions to the jurors. For additional support, the government relies on a number of cases. *See United States v. Bamberger*, 456 F.2d 1119, 1128 (3d Cir. 1972) (regarding courtroom outbursts by co-defendant, court noted that "[s]o long as [the trial judge] accords the necessary protection to the passive defendant within the parameters of sound judicial discretion we should not disturb his decision."); *Tejeda*, 481 F.3d at 54 (regarding threats by spectators, court concluded that the district court "observed the demeanor of each juror and concluded that each could be impartial" and that the district court handled the matter correctly); *United States v. Copeland*, 51 F.3d 611, 613-14 (6th Cir. 1995) (regarding threats by spectators, the court concluded that the district court did not abuse its discretion because the trial judge investigated the merits of each charge and gave cautionary instructions).

While it is true that in the vast majority of cases, the trial judge can cure the bias that may develop in jurors' minds by issuing cautionary instructions and conducting *voir dire*, this case clearly involves a unique set of circumstances that compels this Court to return to first principles and ascertain what the right to a fair trial truly means. Certain courtroom situations are so beyond the pale, so prejudicial, that no amount of *voir dire* and cautionary instructions can remedy the defect. The Supreme Court has identified a number of these scenarios. *See, e.g.*, *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986)

(customary courtroom security force supplemented by four uniformed state troopers sitting in the first row of the gallery); *Bruton v. United States*, 391 U.S. 123, 137 (1968) (admission of co-defendant's confession implicating defendant); *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966) (pretrial publicity combined with disruptive influences in the courtroom); *Remmer v. United States*, 350 U.S. 377, 381 (1956) (associate of defendant attempted to bribe juror). The essential standard in this area of jurisprudence, as articulated by the Supreme Court, is that an episode is deemed inherently prejudicial if "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook*, 475 U.S. at 570 (quoting *Estelle v. Williams*, 425 U.S. 501, 505 (1976)). The toxic nature of the potential prejudice in such cases is so inherent to the misconduct that "little stock need be placed in jurors' claims to the contrary." *Id.*

Previous cases where the courtroom behavior and atmosphere spiraled out of control in this manner are indeed rare. The Fifth Circuit dealt with a similar set of circumstances in *Braswell v. United States*, 200 F.2d 597, 602 (5th Cir. 1952). In that case, there were seven co-defendants who were being tried jointly for possession of marijuana. During the trial and in the presence of the jury, two of the co-defendants physically assaulted a United States Marshal. In addition, one of the defendants had to be physically restrained from swallowing a capsule. The Fifth Circuit ruled that these actions prejudiced the other defendants in the mind of the jury, and reversed the district court's denial of a mistrial.

In the instant case, it is without question that the district court was judicious in its use of *voir dire* and cautionary instructions. But sometimes this is not enough; things should have never evolved and erupted in this manner. To be sure, the district court has wide latitude to

control courtroom atmosphere and unruly defendants. *See Illinois v. Allen*, 397 U.S. 337 (1970). The combination of what the jury was exposed to in this case—Patterson garbed in prison attire verbally assaulting his attorneys, a campaign of intimidation by members of the gallery, a violent courtroom brawl—amounts to prejudice. This is especially true when considering that the government's theory of the case was that Patterson and Mannie were dangerous members of a street gang.[3] If the jury had witnessed these events in the context of a tax evasion case, it would likely be viewed as less prejudicial. But given the government's theory, and given the air of intimidation, the outbursts, and the violence that the jury witnessed, it is clear that there was an impermissible risk that some jurors voted to convict based on the perception that Mannie was a violent gangster who needed to be incarcerated for the safety of the community.

To reiterate, this set of circumstances is truly rare, and it should remain so, or, ideally, nonexistent. Yet trials are, in the end, human events: disruptions are bound to occur. Cautionary instructions and jury interviews should remain the primary weapons against improper jury bias. It is axiomatic in our system of justice that an individual is entitled to a fair trial—not a perfect one. Nevertheless, the distance between the concepts of fair and perfect cannot be so great as to render the former meaningless. To rule that Mannie received a fair trial in the context of this courtroom scene would be to do exactly that.

---

[3] The defense's theory of the case, in relation to Mannie, was that he was by no means a gang member, but instead Patterson's long-time friend who was doing a favor for one of his heroes.

### III.  Conclusion

For the foregoing reasons, we VACATE Mannie's conviction and REMAND for a new trial.

A true Copy:

      Teste:

               _____
               *Clerk of the United States Court of*
               *Appeals for the Seventh Circuit*