In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 16-1995 & 16-2113

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HERMAN JACKSON and
JANNETTE FARIA,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 00800 — **Sharon Johnson Coleman**, *Judge.*

ARGUED APRIL 19, 2017 — DECIDED JUNE 13, 2017

Before BAUER, POSNER, and HAMILTON, *Circuit Judges*.

BAUER, *Circuit Judge.* A jury convicted Herman Jackson of
two counts of mail fraud in violation of 18 U.S.C. § 1341 and
nine counts of wire fraud in violation of 18 U.S.C. § 1343, as
well as two counts of making a false statement in violation of
18 U.S.C. § 1001 for his role in the scheme. Jackson's former

wife and codefendant, Janette Faria, was convicted of one count of mail fraud, six counts of wire fraud, and one count of making a false statement. Defendants-appellants timely appealed, raising several challenges, including to the sufficiency of the evidence. We affirm.

## I. BACKGROUND

This case stems from a scheme to defraud the State of Illinois by falsely obtaining child care subsidies intended for low-income families. Between 2003 and 2011, Jackson operated three daycares in succession, all located in Cicero, Illinois: St. Peters Christian Academy; Jubilee Daycare Center; and ABC Cicero. Jackson housed the daycares in a building next to the Ark of Safety Apostolic Faith Temple where he served as pastor. Subsidies from the State of Illinois' Child Care Assistance Program largely funded the daycares. Before turning to the facts of this case, it is necessary to provide a brief overview of CCAP.

CCAP is designed to provide low-income, working families with affordable child care in order to allow parents to work, go to school, or pursue job training. CCAP requires eligible families to pay a portion of the cost of child care on a sliding scale according to family size, income, and number of children enrolled in daycare. A family's share of the cost is referred to as a co-payment, with the State paying the remaining costs through CCAP. The subsidies are paid directly to the childcare provider.

Illinois Action for Children (AFC), a childcare resource and referral agency, administered CCAP in Cook County, Illinois. AFC sent childcare providers the applications for CCAP, and

then processed the forms after they were completed. As part of the application, parents were required to report certain information, including the place of employment or the name of educational institution that they attended, the employment or school schedule, income, the number of children enrolled in daycare, the name of childcare provider, and the number of hours that the children were in daycare. Parents also had to provide documentation verifying their income, such as pay stubs or letters of employment.

Eligibility for the program generally lasted six months. Toward the end of the six-month term, AFC sent the childcare provider a redetermination form, which was an abbreviated application requiring parents to resubmit most of the information contained in the initial application. Failure to submit a redetermination form resulted in a loss of the subsidy. Childcare providers submitted monthly reports to AFC, referred to as childcare certificate reports, which documented the days and hours that children covered under CCAP attended childcare. In turn, AFC issued payment by check or direct deposit to childcare providers.

The crux of the government's case is that Jackson, along with Faria, submitted or directed the submission of dozens of CCAP applications, employment verification letters, redetermination forms, and monthly childcare certificate reports that contained materially false information. Specifically, the government contends that Jackson, along with Faria in connection with ABC Cicero, defrauded the State by: (1) billing for part-time children as though they attended full time; (2) billing for children who never attended the daycares; (3) billing for children who likely failed to qualify for subsidies because

either their parents made too much money or were unemployed; and (4) billing for months of childcare services that were not provided because the daycares were not operational. In total, the State paid over $2.28 million in subsidies to Jackson's daycares.

On October 11, 2012, a federal grand jury returned an indictment that charged Jackson with two counts of mail fraud, ten counts of wire fraud, and two counts of making a false statement. Faria was charged with one count of mail fraud, seven counts of wire fraud, and one count of making a false statement. The district court dismissed one count of wire fraud as to both defendants-appellants prior to trial. Jackson and Faria proceeded to trial on September 9, 2015. Two days later, Jackson fired his attorney and proceeded *pro se*, with the attorney serving on standby for the remainder of the trial. The following evidence was adduced at trial.

## A. St. Peters Christian Academy

In 2002, Jackson opened St. Peters Christian Academy, which he owned and operated until it closed in early 2004. Jackson's ex-wife, LaKeisa Jackson, served as teacher, cook, and director of the daycare. Ms. Jackson testified that she and Jackson falsified information in paperwork submitted to AFC, including parental employment information, income verification letters, and the number of hours of childcare being provided. Jackson also falsified or directed Ms. Jackson to falsify information in applications and redetermination forms submitted for their own children. Ms. Jackson also testified that Jackson used the alias "Henry Walker" and directed her to use the alias "Maria Young" on AFC paperwork. The aliases were

used to submit numerous false employment verification letters to AFC.

Ms. Jackson stated that Jackson generally completed the childcare certificate reports, but occasionally directed her to do so. The State paid the maximum monthly reimbursement to the provider as long as the children attending the daycare received care for 80% of the days for which they were eligible. Jackson instructed Ms. Jackson to falsify the reports to ensure that the daycare received the maximum reimbursement for enrolled children. Ms. Jackson testified that Jackson became angered when she completed the reports with accurate attendance information because St. Peters lost money. The next time she completed the reports, Jackson stood over her to ensure the attendance rate was inflated sufficiently to receive the maximum subsidy.

Hugo Gonzalez and Roxana Rios, both parents with children attending St. Peters, testified about Jackson's fraudulent conduct. Gonzalez stated that Jackson submitted an application on his behalf that significantly underreported his income. The application also stated that Gonzalez was a janitor at St. Peters; he actually worked at PepsiCo. Jackson signed the application using his alias, "Henry Walker." In addition, Jackson submitted childcare certificate reports for Gonzalez's child for more than a year after his child left the daycare in order to continue collecting subsidies. During that time, two recertification forms containing falsified information about Gonzalez's occupation and income were submitted to AFC with Gonzalez's forged signature.

Similarly, Rios testified that the application submitted to AFC falsified her occupation and stated incorrectly that she worked full-time instead of part-time. Rios worked as a part-time teacher's assistant at St. Peter's, but her application stated that she was a janitor. Her application was signed using Jackson's alias. Jackson submitted monthly childcare certificate reports to AFC representing that Rios' daughter attended St. Peters from December 2002 through January 2004; Rios' daughter did not attend St. Peters during this period. A forged recertification form with falsified information was submitted to AFC on her behalf.

Lasana McNealey, a former AFC supervisor, testified that Jackson provided him with cash payments in exchange for expediting processing of St. Peters' applications and recertification forms. McNealey also stated that after noticing that most of the applicants worked at St. Peters, he called the employer phone number listed on the applications in order to verify employment. He asked to speak with Henry Walker, who was listed as the contact on the employment verification letters. McNealey testified that after asking to speak with Henry Walker, Jackson answered the phone and verified the parents' employment. McNealey was fired in January 2004, in part because of "issues with Mr. Jackson's daycare center."

Soon after McNealey's departure from AFC, subsidy payments stopped being disbursed to St. Peters, and the daycare closed. In total, more than $895,000 in AFC subsidy payments were disbursed to St. Peters. Ms. Jackson testified that Jackson spent the subsidy payments on houses and luxury cars, as well as his church. The government presented financial records corroborating these purchases.

### B. Jubilee Daycare Center

Jackson launched a new daycare in late 2005, operating out of the same space as St. Peters. Jackson recruited Denise Pugh to serve nominally as the owner of Jubilee; her name was used on the Illinois Department of Children and Family Services' application to open the daycare and on the incorporation documents filed with the State. Pugh was unemployed, lacked any daycare experience, and lived in a classroom on the second floor of the daycare. Pugh testified that if she permitted Jackson to open up the daycare in her name, she would have a "job for life." Ms. Jackson testified that the daycare was opening in Pugh's name so that "the licensing information and everything would be able to go through."

Despite opening Jubilee in Pugh's name, Jackson remained responsible for the daycare. He made the hiring decisions, submitted monthly childcare certificate reports, and controlled the daycare's bank account. Pugh performed such tasks as opening the daycare, greeting parents and children, and assisting with the completion of applications. Initially, Pugh received no compensation for her employment; eventually, Jackson paid her $400 per pay period. Pugh testified that Jackson used several aliases while operating Jubilee.

Ms. Jackson worked at Jubilee for several months but resigned after she discovered that Jackson was withholding taxes from Jubilee employees' paychecks, but not submitting the withholding to the IRS or Illinois Department of Revenue. Ms. Jackson testified that Jackson, as he did previously at St. Peters, falsified information in AFC applications pertaining to the Jackson's children. In addition, another parent, Maria

Alcantar, testified that although she submitted an AFC application, she chose not to enroll her daughter at Jubilee. Nonetheless, Jackson submitted monthly childcare certificate reports documenting that her daughter attended Jubilee full-time from June to November of 2008, and the State paid Jubilee based on the falsified reports.

DCFS permanently closed Jubilee due to unsafe and unsanitary conditions on August 18, 2008. However, Jackson continued submitting monthly childcare certificate reports to AFC with Pugh's forged signature from August 2008 to January 2009. As a result, the State paid out more than $12,000 for daycare services that never occurred.

### C. First FBI Interview

Before the close of Jubilee, an FBI agent interviewed Pugh about Jubilee's operations. After Pugh reported the meeting to Jackson, he told Pugh that if the FBI approached her again, she should tell them that Jackson had no direct involvement with Jubilee, and that Pugh rented Jubilee from Jackson.

On August 11, 2008, two FBI agents interviewed Jackson. He told them that he had no affiliation with Jubilee. He also stated that he was not an "authorized signer" on Jubilee's bank account. At trial, the government introduced bank records showing Jackson as a signatory on Jubilee's bank account.

### D. ABC Cicero Kids

A year after the close of Jubilee, Faria met with a Beth Girardier, a DCFS daycare licensing representative, about launching a new daycare, ABC Cicero, in the same space as Jubilee and St. Peters. Faria told Girardier that she was the

owner of ABC Cicero and gave Jackson a down payment to open the daycare. Girardier performed a site visit prior to ABC Cicero's opening and found that the daycare had unqualified staff and an infestation of various insects. After Faria rectified the deficiencies found by Girardier, DCFS granted ABC Cicero a permit.

Faria hired Ruth Magos as the director of ABC Cicero; she worked at the daycare for six months. Faria described herself as the owner of ABC Cicero during Magos' interview. Magos testified that initially she set the employees' schedules, but Faria took over that responsibility. Faria also managed the hiring of all ABC Cicero's employees. Magos testified that all calls to the daycare were forwarded to Faria's cellular telephone. Magos stated that she only saw Faria at ABC Cicero a couple of times; she believed that Faria was living in Georgia. However, the two communicated by telephone or email regularly.

Magos testified that Faria billed AFC for three months of childcare services provided to Magos' children, when in fact her children never attended ABC Cicero. She also testified that Faria, sometimes using the alias "Ana Ortiz", billed AFC for the full-time attendance of children who only attended part-time. ABC Cicero billed and received subsidies for a period of more than five months after the daycare had closed. Several daycare employees, including Natalie Navarro and Hollie Vela, corroborated Magos' testimony. The State paid out more than $166,000 for daycare services during the five months after ABC Cicero closed.

Vela also testified that she initially communicated with Faria over the phone regarding operational issues at the daycare, such as lack of supplies and complaints from parents, but at some point Jackson, under the alias "Keith", took over all communications pertaining to the daycare. She always spoke to him by phone. Eventually, Vela overheard the pastor of Ark of Safety Church speaking, and she realized that it was "Keith's" voice. Another employee, Shandelle Olofson, also testified that she called Faria about the daycare, and Jackson, under the alias "Chris", answered the phone. She later realized after hearing Jackson speak that they were the same individual.

On February 17, 2011, Tiffany Cole, a health inspector for the Town of Cicero, shut down ABC Cicero due to unsafe and unsanitary conditions. Robin Bralower, who managed ABC Cicero at the time, testified that she called Faria to notify her of the closure. Bralower stated that she returned three weeks after the closure to retrieve items that she left, and there were no children or teachers there. Cole testified that city inspectors returned to the daycare to confirm that it remained closed.

### E.  The Single Mom's Ministry

Jackson started SMM with the aim of hiring single mothers with multiple children to work at the church. The mothers' employment involved attending church services on Sundays and attending Bible study classes several times a week; in exchange, Jackson paid them minimum wage. Program participants were required to enroll their children at ABC Cicero. Jackson expelled anyone from SMM who elected to use a different daycare.

Jackson hired Sharon Ruff to run the program. He told her the program was funded by a grant, corporate sponsors, and wealthy individuals.

Several SMM participants testified at trial. Each detailed how ABC Cicero billed AFC for children that did not actually attend the daycare, or billed for children at full-time status who only attended part-time.

### F.   Second FBI Interview

FBI Special Agent Laura Miller testified regarding her telephone interviews with Faria on November 21 and 22, 2011. Miller stated that during the first call, Faria identified herself as the owner of ABC Cicero. When Miller asked Faria who Ana Ortiz was, she stated that Ortiz was an employee of ABC Cicero but was uncertain of her position at the daycare. Miller inquired about ABC Cicero's closure, and Faria stated that the daycare closed due to health violations, but that she was unsure of the date of its closure.

An hour later, Miller spoke with Faria again. Faria told Miller that she continued to operate ABC Cicero after the closure by sneaking children in a side door. At this point, Miller believed Jackson was also on the phone, and told Faria so. Jackson acknowledged his presence on the phone call, and admitted to his involvement in the operation of ABC Cicero. He agreed to speak with Miller the next day.

The next day Miller and an agent from the Department of Health and Human Services spoke with Jackson and Faria. Jackson stated that he would occasionally fax in the monthly childcare certificate reports to AFC on behalf of Faria. He also

stated that ABC Cicero continued to operate in secret after it closed; Faria reiterated this claim. Faria also acknowledged that she completed and submitted the monthly certificate reports to AFC, and that she used the alias "Ana Ortiz" to sign the reports.

### G. Jury Verdict and Sentencing

The jury found defendants-appellants guilty of all counts on which they were tried. Defendants-appellants filed post-trial motions challenging, among other things, the sufficiency of the evidence. The court denied the motions. On April 29, 2016, the court sentenced Jackson to 60 months' imprisonment.[1]

At Faria's sentencing hearing, the court calculated a Guidelines range of 37 to 46 months, based on a total offense level of 21 and a criminal-history category of I. The court then analyzed the sentencing factors under 18 U.S.C. § 3553(a). In particular, the court addressed the seriousness of the offense, the need for general deterrence, the nature of the circumstances of the offense, and the need to avoid unwarranted sentencing disparities. The court imposed a sentence of 13 months' imprisonment, substantially below the Guidelines range. The court stated that the sentence was appropriate in light on Faria's lack of criminal history and the unlikelihood that she would recidivate. The court also noted Faria's remorse for her conduct and her difficult upbringing.

---

[1]  Because Jackson does not challenge his sentence, we omit the facts surrounding his sentencing hearing.

## II. DISCUSSION

On appeal, defendants-appellants renew the issues raised in their post-trial motions. Defendants-appellants argue that the evidence at trial was insufficient to support their convictions for mail and wire fraud. Additionally, Faria also argues that the court committed plain error by failing to grant a mistrial as a result of certain conduct by Jackson. Next, she contends that the district court erred by permitting the jury to have a redacted copy of the indictment. Finally, she contends that her sentence is substantively unreasonable. We address each argument in turn.

### A. Sufficiency of the Evidence Challenge

This court has described the task of successfully challenging a conviction based on insufficient evidence as "a daunting one, as the standard of review … is necessarily rigorous." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003). We must be persuaded that after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Durham*, 645 F.3d 883, 892 (7th Cir. 2011) (citation omitted). The requisite elements of mail or wire fraud are: (1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mail (for 18 U.S.C. § 1341) or interstate wires (for 18 U.S.C. § 1343) in furtherance of that scheme. *United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014) (citations omitted).

Both defendants-appellants raise a sufficiency challenge. We first address Jackson. He argues that the evidence at trial was insufficient to prove that he intended to defraud the State. In fact, the evidence of Jackson's intent to defraud was over-

whelming. LaKeisa Jackson testified that at St. Peters she and
Jackson used aliases to submit falsified AFC applications,
redetermination forms, and childcare certificate reports. She
testified that the certificate reports were falsified in order to
maximize the subsidy payments. Jackson obtained over
$895,000 in AFC subsidies at St. Peters, which he spent on
houses and luxury cars. Ms. Jackson stated that after St. Peters
closed, Jackson hid behind Pugh's name to open Jubilee and
resume his scheme. At Jubilee, Jackson managed the operations
and the daycare's bank account. According to Ms. Jackson, he
again submitted falsified AFC applications and childcare
certificate reports. He also failed to report his employees'
payroll taxes. Jackson's intent to deceive authorities is under-
scored by his false statements to the FBI regarding his affilia-
tion with Jubilee.

Regarding ABC Cicero, several SMM participants testified
that the daycare overbilled the State for their children's
attendance at the daycare. Employees testified that Jackson,
under the aliases "Chris" and "Keith", in conjunction with
Faria, directed operations of the daycare via telephone.
Furthermore, after ABC Cicero closed, defendants-appellants
continued to bill the State for several months of childcare
services, obtaining more than $166,000 in subsidies. Although
defendants-appellants claimed that after ABC Cicero closed
they continued to operate the daycare by sneaking children in
the side door, multiple witnesses testified to the contrary.
There is ample evidence for a jury to find beyond a reasonable
doubt that Jackson intended to defraud the State.

Faria also argues that no reasonable jury could conclude
that she acted with an intent to defraud. She contends that her

involvement at ABC Cicero was minimal, demonstrated by the fact that witnesses saw her at the daycare only a few times. We disagree. Witnesses testified that Faria hired and fired the employees, set the schedule, and had all phone calls forwarded to her cell phone. The government introduced evidence proving that Faria was a signatory and controlled the daycare's bank accounts. Therefore, the evidence of her involvement at ABC Cicero was substantial.

Although Faria is correct that no witness testified to seeing her complete a childcare certificate report, Agent Miller testified that Faria admitted to submitting reports under the alias "Ana Ortiz." The government introduced numerous fraudulent reports signed by "Ana Ortiz," including most of the reports for the period after ABC Cicero closed. In addition, both Magos and Bralower, former directors of ABC Cicero, testified to either faxing the AFC paperwork or leaving it for Faria to pick up. As mentioned above, Faria attempted to conceal the fraudulent childcare certificate reports submitted after the daycare's closure by claiming that the daycare continued to operate by sneaking children in the side door. Again, Faria and Jackson obtained $166,000 in subsidies for that period of time. Such evidence is sufficient to prove that Faria intended to defraud the State. Consequently, we will not disturb the jury's verdict as to the mail and wire fraud counts.

## B. Joint Trial Challenge

Faria argues that having a joint trial unduly prejudiced her due to certain conduct by Jackson. She offers a host of reasons. She contends that Jackson made an argument during closing about purported contracts he made with parents that permit-

ted him to bill the State for times when the child was not at daycare, an argument that Faria claims is an admission of criminal activity that incriminated her. She also claims he inappropriately called government witnesses "liars" during closing. Finally, she argues that he introduced irrelevant facts and sexual innuendo at trial. Faria concludes that, therefore, she was denied her right to a fair trial.

Faria has the burden of demonstrating that she was prejudiced by the joint trial. *United States v. Oglesby*, 764 F.2d 1273, 1275–76 (7th Cir. 1985). "[W]hether a trial of two defendants tried simultaneously infringes upon a defendant's right to a fair trial depends on whether it is within the jury's capacity … to follow admonitory instructions and to keep separate, collate and appraise the evidence relevant only to each defendant." *Id*. at 1276 (citation omitted). We have held that "[a] trial involving a *pro se* defendant and co-defendants who are assisted by counsel is not prejudicial *per se*." *Id*. (citations omitted).

Faria has not met her burden in proving she was prejudiced by the joint trial. The Supreme Court has articulated a preference for joint trials in the federal system in cases where defendants are indicted together because "[t]hey promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (citations and quotation marks omitted).

Faria does not suggest, and our review of the record has not indicated, that most of the problematic issues associated with joint trials identified in *Oglesby* occurred in this case. Those

issues include: "antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive;" "a massive and complex quantity of evidence making it almost impossible for the jury to separate evidence as it related to each defendant when determining each defendant's innocence or guilt;" and, "gross disparity in the weight of the evidence against the defendants[.]" *Oglesby*, 764 F.2d at 1276 (collecting cases).

Faria claims that Jackson's statement during closing regarding purported contracts inculpated her, which is an issue we recognized in *Oglesby. See id*. However, in Faria's case, this claim lacks merit. Faria argues that Jackson's statement prejudiced her and violated her Confrontation Clause rights because she could not cross-examine him on that statement. The notion of a contract that permitted the fraudulent billing practices was introduced by LaKesia Jackson during her testimony. Faria's counsel was free to cross-examine Ms. Jackson on the issue to combat any inculpatory effect the statement might have. In addition, this testimony was provided specifically with respect with to Jackson's scheme at St. Peters and Jubilee; neither counsel nor witness mentioned ABC Cicero or Faria. We do not believe Faria's Confrontation Clause rights were violated. Further, we are not persuaded that Jackson's closing argument inculpated Faria.

Turning to Faria's other arguments, she relies on *United States v. Mannie*, 509 F.3d 851 (7th Cir. 2007), to support her contention that Jackson calling the government witnesses liars, as well as introducing irrelevant facts and sexual innuendo, deprived her of a fair trial. *Mannie* cannot carry the day, however, as it is factually inapposite. In *Mannie*, a codefendant

continually disrupted court proceedings, verbally assaulted and attacked his attorneys. 509 F.3d at 853–55. Members of the gallery also engaged in a campaign of harassment and intimidation of the jurors. *Id.* at 855. We found that the rare circumstances present in *Mannie* denied the defendant a fair trial. *Id.* at 857. Conversely, Jackson comported himself professionally during the duration of the trial. There is nothing remarkable about Jackson characterizing government witnesses as liars in a closing argument. Moreover, Faria has failed to identify any irrelevant facts or specific instances of sexual innuendo introduced by Jackson. Consequently, Faria has failed to carry her burden in proving she was prejudiced by the joint trial.

Even if we maintained doubt about any prejudicial effect of a joint trial, the district court adhered to the procedures set forth in *Oglesby* regarding joint trials involving *pro se* defendants to minimize any prejudice to Faria. *See* 764 F.2d at 1275 (citation omitted). The court appointed standby counsel. It repeatedly instructed Jackson to refrain from speaking in the first person. The court instructed the jury about Jackson's dual role as defendant and *pro se* attorney, and instructed that nothing the lawyers said is evidence. In a further effort to limit any prejudice to Faria, the court also directed the jury to consider evidence against the defendants-appellants separately. Therefore, we are satisfied that the district court did not deprive Faria of a fair trial.

### C. Indictment Challenge

Next, Faria argues that the district court erred by providing a redacted copy of the indictment to the jury. She contends that the indictment unduly prejudiced her before the jury by

linking her to Jackson's criminal conduct at his first two daycares. We conduct our review for abuse of discretion. *United States v. Vega*, 72 F.3d 507, 517 (7th Cir. 1995) (citation omitted).

As an initial matter, we note that providing a copy of the indictment to the jury is common practice. *See Pattern Criminal Jury Instructions of the Seventh Circuit* (2012 ed.) § 1.02 Comm. cmt. In accordance with the Pattern Jury Instructions Committee Comment, all references to the grand jury were deleted. The court also struck the signature line for the grand jury foreperson and United States Attorney. In addition, Count Eight was deleted and the subsequent counts renumbered. The forfeiture allegation was also omitted.

Furthermore, the indictment itself does not make any reference to Faria having involvement with any daycare other than ABC Cicero. The government made clear numerous times that Faria's involvement in the scheme was limited to ABC Cicero. Therefore, we find it unlikely that indictment caused the jury to connected Faria to Jackson's schemes at the first two daycares.

To the extent there was any confusion by the jury about the legal significance of the indictment, the court gave a proper limiting instruction prior to opening statements, and read Pattern Jury Instruction 1.02 prior to the jury's deliberation. The court also provided a written copy of the instruction for use during deliberation. This was sufficient to address Faria's concerns regarding the propriety of providing the redacted indictment to the jury. *See United States v. Watts*, 29 F.3d 287, 291 (7th Cir. 1994) (affirming the district court's decision to

provide a copy of the indictment where the court instructed the jury that the indictment was not evidence and did not create any inference of guilt). The district court did not err by providing a redacted copy of the indictment.

### D. Sentencing Challenge

Faria's final argument is that the district court's decision to impose a prison sentence rather than probation renders her sentence substantively unreasonable. Faria further contends that the court failed to give proper weight to mitigating factors. We disagree.

We conduct our review under an abuse of discretion standard. *United States v. Anderson*, 580 F.3d 639, 651 (7th Cir. 2009) (citation omitted). "Where, as here, the district court imposes a below-guidelines sentence, it is presumed that the sentence is not unreasonably high." *Id.* (citation omitted). "We will uphold [a] sentence so long as the district court offered an adequate statement of its reasons, consistent with 18 U.S.C. § 3553(a), for imposing such a sentence." *United States v. Abebe*, 651 F.3d 653, 657 (7th Cir. 2011) (citation and quotation marks omitted).

The district court provided a more than adequate statement of its reasons. The court spoke at length about the reasons undergirding the sentence, in particular the seriousness of the offense, the need for general deterrence, the nature of the circumstances of the offense, and the need to avoid unwarranted sentencing disparities. In addition, the court gave consideration to several mitigating factors, including Faria's lack of criminal history, low probability for recidivism, remorse for her conduct, and difficult upbringing. Faria's contention

that the court failed to give sufficient consideration to mitigating factors is without merit, as "sentencing judges have discretion over how much weight to give a particular factor." *United States v. Reibel*, 688 F.3d 868, 872 (7th Cir. 2012) (citation omitted). Faria has offered no persuasive justification for disturbing the presumptive reasonableness of her sentence. We conclude that Faria's sentence is substantively reasonable.

### III.  CONCLUSION

We AFFIRM Jackson's conviction, as well as Faria's conviction and sentence.